ISLE OF THYE LAND COMPANY ET AL. *v.*
WHISMAN, Adm'x of the Estate of James
J. Whisman ET AL.

\* \* \*

WHISMAN *v.* TRISKA

[No. 489, September Term, 1970.]

*Decided June 29, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*James F. Couch, Jr.,* for appellants.

*James D. Newton* for Harriet B. Whisman, etc. Submitted on brief by *Manfred J. Schmidt* for Ralph F. Triska.

BARNES, J., delivered the opinion of the Court.

On February 22, 1971, the Circuit Court for Prince George's County, in equity, (Robert B. Mathias, J.) filed a decree in a suit for declaratory judgment pursuant to the Uniform Declaratory Judgment Act, Code (1957), Art. 31A, § 1 *et seq.*, instituted by the appellee and cross-appellant, Harriet B. Whisman, administratrix of the estate of James J. Whisman, deceased (her late father), against Ralph F. Triska, one of the appellees who was the principal promoter of an elaborate development of land in Prince George's County known as Tantallon on the Potomac (Triska), and the appellants and cross-appellees, Isle of Thye Land Company, a corporation which continued the development of Tantallon (Isle of Thye) and its successor corporation, Prestwick, Inc. (Prest-

wick). Judge Mathias decreed that the provisions of a written contract, dated June 14, 1960, as amended by a later written contract made "as of" September 14, 1960, between Dr. James J. Whisman, the decedent of the administratrix, Harriet B. Whisman, and Triska (the contract) were declared to be binding on Isle of Thye and Prestwick; that the administratrix had the right to exercise the option provided in the contract to take either a 3½% interest in Prestwick or the sum of $100,000.00; and that if the election was to take the $100,000.00, the administratrix should have judgment for that amount against Isle of Thye and Prestwick, jointly and severally, together with interest from the date of the exercise of the option. The correctness of these rulings is presented to us by these appeals and cross-appeals.

The Tantallon development was previously before us in regard to one of its zoning aspects. See *MacDonald v. Board of County Commissioners for Prince George's County,* 238 Md. 549, 210 A. 2d 325 (1965), in which this Court reversed the order of the Circuit Court for Prince George's County sustaining the action of the Board of County Commissioners for Prince George's County in the rezoning of 29 acres of land from the R-R (Rural Residential) zone to the R-H (Multiple Family, High Rise Residential) zone so that Isle of Thye could not erect righ rise apartments on the 29 acres. This decision of the Court had a peripheral effect upon the contract as we will point out later in this opinion.

At the time of trial before Judge Mathias six witnesses testified, *i.e.,* James R. Thompson, a golf course architect who became a shareholder and officer of Isle of Thye (Thompson); Triska, who had conceived the Tantallon development and had made the contract with Dr. Whisman; Edward W. Nylen and John D. Gilmore, attorneys for Triska who handled the settlement under the contract and who prepared many of the relevant documents; Durand Holladay, who testified in regard to the financing provided by Continental Mortgage Investors (Continental) and the transfers to Prestwick; and, fi-

nally, Edward J. Cook, who for part of the relevant period was Triska's partner. A substantial amount of evidence was produced and a number of elaborate documents were introduced into evidence. Dr. Whisman was not available for testimony, having died on October 7, 1964. The record extract consists of 433 printed pages. Judge Mathias, after hearing all of the evidence and the arguments of counsel for the respective parties, filed a detailed and carefully considered Memorandum and Opinion, making certain findings of fact and conclusions of law to which we will later refer in this opinion.

Triska and his partner, Cook, conceived a plan for a luxurious residential real estate development complete with marina, golf course, country club and other amenities in the southwestern portion of Prince George's County on Swan Creek which empties into the Potomac River. For a detailed description of this concept, see the majority and dissenting opinions in *MacDonald, supra* (238 Md. at 551 and 582-84, 210 A. 2d at 326 and 344-45). As early as 1958 Triska and Cook began assembling the 655 acres of land which were to be used in the creation of the Tantallon development. A key parcel of land in this contemplated development was a tract of approximately 107 acres owned by Dr. Whisman. Triska had known Dr. Whisman for some four or five years; and although he found Dr. Whisman to be somewhat eccentric, the Doctor was knowledgeable and sophisticated in regard to land development and land values. Triska outlined the proposed development to Dr. Whisman with such enthusiasm that he communicated his enthusiasm to Dr. Whisman who was persuaded to sell his 107 acres; but Dr. Whisman, nevertheless, desired a good price for his land, which he stated to be $3,000.00 an acre. He compromised, however, during the negotiations with Triska and finally agreed upon a cash price of $2,000.00 an acre in addition to which Dr. Whisman was to receive an interest in the proposed high rise apartment complex which was a part of the over-all plan of development. Triska testified that he explained to Dr. Whisman

that he had Cook as a partner and that "we ultimately would probably put it in the form of a corporation," depending upon the financing requirements and tax consequences but "we presumed at that point it would be a corporation."

A written contract was prepared by Triska, without the assistance of counsel and signed by Dr. Whisman without the advice of counsel on June 14, 1960. By this contract the 107 acre tract—situate in the Piscataway District of Prince George's County and being a part of "Warburton Manor" — was sold by Dr. Whisman to Triska, who deposited $1,000.00 to be applied to the purchase price upon the following terms:

1. The purchase price was $214,000.00 on the basis of $2,000.00 an acre, secured by a first deed of trust for "213,000.00 with 6% interest"; the interest only was to be paid for the first two years, beginning March 1, 1961, and payable semi-annually thereafter; after the second year, the principal of the deed of trust would be paid in 16 installments, with the right to prepay without penalty.

2. Dr. Whisman agreed to subordinate the lien of the deed of trust to "any legitimate construction loan" obtained by Triska and to release the lien at the rate of $1,-800.00 per building lot; land otherwise released would be at the rate of $2,500.00 per acre in minimum blocks of five acres, to be selected by Triska but contiguous to land previously released, with the right of Triska to select land for release "at least two points not in themselves contiguous."

3. It was recited that Dr. Whisman reserved approximately five acres from the over-all parcel for his own use to be particularly described in the deed to be given at settlement; Triska was given the right to purchase this five acre parcel, at the option of Dr. Whisman at $3,000.00 per acre for a period of five years from the date of the contract and thereafter Triska "shall have the right of first refusal."

4. In addition to the total cash purchase price of $214,-

000.00, Dr. Whisman was to obtain a 2% interest in "a contemplated apartment project" of Triska "or of an assignee of his."

5. Added by an addendum to the contract of July 14, 1960, duly initialed by both parties, was a provision that at the end of six years from the date of settlement (which was to be selected by Triska but not more than 90 days from the contract date) if the approximately 1,000 unit apartment project had not been completed, Dr. Whisman, at his option, could receive in the place of the 2% interest in the apartment project, either:

> (a) 3% of the equity capital stock of the "holding corporation controlling the overall development of the project," or
>
> (b) 10% of the equity capital stock of the utility corporation formed to provide sewer and water service to the project; *provided* that Triska, if Dr. Whisman exercised either of the options (a) and (b), *supra*, should have the right to satisfy the "exchange obligation" by the payment of $125,000.00 either in one payment or in equal installments over a five year period "with interest at six per cent per year on the unpaid balance."

There were also provisions that the contract of June 14, 1960, "may be assigned"; that rents, taxes, water rent, etc. were to be adjusted to the date of transfer; that, as indicated, the date of settlement should be selected by Triska, but not more than 90 days from the contract date, a failure to settle to result in the forfeiture of the deposit only and with no further liability by Triska; that Triska should select the title company; that possession be given at settlement; and, that the deed of trust securing the purchase money "shall contain those covenants listed in this Contract of Sale as desired by the parties to safeguard their interests."

The contract of June 14, 1960, was amended by a written contract "as of" September 14, 1960, which recited the execution of the contract of June 14 and that Dr.

Whisman was to obtain a percentage interest in the apartment project as part of the purchase price and it was provided that in the deed of trust securing the deferred purchase money that it "should contain such covenants as was desired by the parties to safeguard their interests" and that the parties "have agreed that it would not be prudent to incorporate the provision respecting the acquisition of the apartment interest in the Deed of Trust and they also desire to set forth the terms and conditions upon which the transfer of interest in the apartment project is to be made and the alternatives therefor."

The amendatory agreement then provided that:

1. Dr. Whisman upon the completion of the contemplated apartment project of approximately 1,000 units and upon other land being acquired by Triska adjacent to "said land," Triska would transfer to Dr. Whisman a $2\frac{1}{2}\%$ interest "in the net equity capital of the project" (vs. $2\%$ in the contract of June 14).

2. If at the end of six years from the date of settlement the apartment project had not been completed, then Dr. Whisman, at his option, and in lieu of the $2\frac{1}{2}\%$ interest in the apartment project, could elect either:

> (a) To receive from Triska $3\frac{1}{2}\%$ (vs. $3\%$ in the contract of June 14) of "the equity capital stock of the holding corporation, or corporations, controlling the overall development of the project, or"
>
> (b) To receive from Triska the sum of $100,000.-00 (vs. $125,000.00 in the contract of June 14) payable at Triska's election in one installment "at September 14, 1966, or in equal installments over a five year period with interest at six $(6\%)$ per cent on the unpaid balance computed from September 14, 1966."

It was further provided that the "covenants and undertakings" to be performed by Triska "shall survive and not merge in the deed, or deed of trust given in pursuance of the contract of sale."

Triska testified, without objection, in regard to the negotiations leading up to the execution of the contract of June 14, 1960, and also explained why the amendatory contract of "as of" September 14, 1960, was negotiated and executed. Triska, after the contract of June 14 had been executed, took the contract to his attorney, Gilmore, for review and to discover whether it would fit into the project as then proposed. Gilmore recommended that Triska seek to negotiate with Dr. Whisman for the elimination of the "options" from the deed of trust inasmuch as Gilmore was of the opinion that these options would impose an obligation running with the land which "would have inhibited, if not prevented, their obtaining a development loan which they needed to develop the property." These "options" were the "covenants" which the contract of June 14 permitted the parties to insert in the deed of trust to protect their interests. Triska proceeded with negotiations with Dr. Whisman to that end and, although it required "a great deal of discussion," including a representation by Triska to Dr. Whisman that his yielding on this point was essential to the project, the supplemental or amendatory agreement of September 14, 1960, was agreed upon with the amendments already set forth. These new terms were actually agreed upon before or at the settlement on September 14, 1960, but were not reduced to writing by Gilmore until sometime after settlement, the written supplementary or amendatory agreement, however, being "as of" September 14, 1960, the settlement date.

At the settlement on September 14, the papers indicated an additional consideration of $100,000.00. The transfer tax and the federal tax stamps noted on and affixed to Dr. Whisman's deed of the property showed a total consideration for the transfer of $311,200.00, even though the cash balance due under the contract was only $210,200.00, Triska having paid a cash deposit of $1,-000.00.

Triska testified that his partnership with Cook was formed in 1961. An unexecuted copy of the written part-

nership agreement was offered and received into evidence. This unexecuted and unconformed copy indicates that it was to be executed sometime in January, 1961, but the proposed acknowledgment indicates an execution sometime in August, 1961. A letter from Gilmore to Triska and Cook, dated June 26, 1961, strongly suggests that the formal partnership agreement had not been executed at the time of that letter, in that a proposed Exhibit A for inclusion in the partnership agreement was enclosed in that letter. This Exhibit A, which refers to the partnership agreement made "as of" January 1, 1961, is a "balance sheet" reflecting the partnership assets and liabilities, excluding cash and personal property (which were to be in the amount determined by the partnership accountant using standard accounting procedures) and significantly Item 8 — under the heading "Parcel of Land Acquired from James J. Whisman" — indicates a cost of the parcel of $211,200.00* with mortgages of $210,200.00. The asterisk refers to the following:

> "* (Plus equity in other property per agreement with Whisman)."

Gilmore, at Triska's request prior to the execution of the amendatory agreement of September 14, 1960, prepared articles of incorporation for Isle of Thye; and it was incorporated on February 20, 1961. Isle of Thye did not actually begin to do business until September 29, 1961, when the partners had obtained financing.

Triska testified that the corporate form for developing the Tantallon project was dictated by Wallace Investments, Inc. (Wallace). Thompson joined the project because he had been helpful in introducing Triska and Cook to the Wallace people. He became a 25% stockholder in the corporation in return for his services as a golf course architect in the design and construction of the Tantallon golf course and country club. Triska and Cook each took a 37½% interest in the corporate stock. It was agreed that all of the partnership assets and li-

abilities were to be transferred to the corporation, although it appears that the partnership was never formally dissolved. Triska testified that the assets of the partnership consisted of land, including the Whisman parcel and the engineering and promotional effort; the liabilities of the partnership consisted of the outstanding deeds of trust and "the $100,000 owed to Dr. Whisman or whatever he elected under his alternatives." The transfer of the land for the project was made in Triska's name—and not in the partnership name—inasmuch as all of the land had been acquired in Triska's name only.

The mechanics of the transfer to Isle of Thye appear in the minutes of the organizational meeting of that corporation on September 28, 1961, at the Hot Shoppes Restaurant in Langley Park. The meeting was attended by Triska, Thompson, Cook and Gilmore. At this meeting at which Triska, Cook and Dorothy M. Parkison, the three directors, were present (Mrs. Parkison being replaced by Thompson) after electing Triska, President; Thompson, Vice President; Cook, Secretary and Harold Crossen, Treasurer, Isle of Thye agreed to purchase from Wallace certain parcels of land for a total purchase price of $2,104,304.00 of which $284,671.46 was to be paid in cash at settlement. Isle of Thye agreed to assume an aggregate unpaid principal balance of $819,632.54 on mortgages encumbering the properties and to give its deed of trust to Wallace to secure the balance of $1,000,000.00.

The following day, Triska sold all of the land he had acquired for the Tantallon project, including the Whisman tract, to Wallace for $1,104,304.00 of which $284,-671.46 was to be paid in cash at closing. The contract of sale between Triska and Wallace recited that Triska had paid in cash the sum of $101,000.00 for the acquisition of the Whisman property although, as we have seen, only a cash deposit of $1,000.00 had been paid by Triska to Dr. Whisman at the time of acquisition of that land by Triska. Triska testified that this additional $100,000.-00 was included in the contract of sale with Wallace because of the future obligations to Dr. Whisman.

At the same time the contract of sale with Wallace was executed, Triska, as President of Isle of Thye, executed an agreement with Wallace to purchase the same land from Wallace in accordance with the decision of the directors the preceding day. By its terms, Isle of Thye was required to pay Wallace $284,671.46 at the time of settlement. Deeds conveying the properties were executed and duly recorded almost simultaneously; other than these deeds, there was no formal transfer of the partnership assets to Isle of Thye and there was no formal assignment of the contract between Dr. Whisman and Triska to Isle of Thye.

Isle of Thye did not have the $284,671.46 to pay Wallace. Triska, however, was to receive this same sum of money in cash at the time of settlement with Wallace; and Triska and Cook agreed to lend Isle of Thye this amount and receive back that corporation's note for that amount payable in 37 months without interest. The amount of $284,671.60 represented $184,671.46 actually invested by the partners, Triska and Cook, in the Tantallon project and the $100,000.00 which might be due to Dr. Whisman. At the settlement, a check for $284,671.60 was given to Triska by Wallace, endorsed by him to Isle of Thye and again endorsed by Isle of Thye, by Triska as its President, to Wallace.

The corporate note of Isle of Thye was duly issued but was retained by Wallace as part of the collateral Wallace required for its loan to Isle of Thye. This note was not included among the obligations of Isle of Thye in its financial statements offered into evidence at the trial. This note was never paid. It was ultimately cancelled and set up on the corporate records of Prestwick as a contribution to the capital of that corporation; but Triska received no greater interest in Prestwick as a result of this contribution to capital.

Gilmore, who had recommended that the future obligation of the partners to Dr. Whisman not be a matter of record, suggested the device of loading this obligation into a note of Isle of Thye as a convenient means of af-

fording the parties the amount needed for its payment without having it appear in the record as a part of the purchase price for the Whisman land. Both Triska and Thompson testified that the $100,000.00 Whisman payment was an obligation of Isle of Thye. Cook testified that he understood that the additional $100,000.00 included in the corporate note was to be used to pay Dr. Whisman in the event he elected to take the $100,000.00 rather than a stock interest. Gilmore testified, on cross-examination, that there was no question in his mind that the additional compensation to Dr. Whisman was part of the purchase price for the Whisman land and that the Whisman land had become a part of the Tantallon project. He further testified that the partnership assets were transferred by the partnership to Isle of Thye, which acquired all of the obligations of record which Triska and Cook had previously assumed. He stated that Triska and Cook "were the promoters of this [the Tantallon] project" and that whatever contracts Triska and Cook entered into "were for the benefit of whatever vehicle they chose to carry forward the development of the project." In his opinion, however, the obligation was only that of Triska and not of Isle of Thye or of Prestwick.

Subsequent to the transactions of September 28 and 29, 1961, Isle of Thye began the development of the Tantallon project which Triska had outlined to Dr. Whisman. Several subsidiary corporations were formed to develop specific parts of the over-all project, including Hatton Point, Inc., to construct the golf course and country club and Tantallon Towers to erect the apartment project. Thompson became President of Hatton Point, Inc., and approximately four fairways of the golf course were built on the Whisman land, occupying about 35 acres of that tract. Land used by Hatton Point, Inc. for the construction of the golf course was leased from Isle of Thye on an established value of $3,000.00 an acre, although no formal lease appears from the record to have been executed. A special exception to permit the construction of the golf course had been obtained under the

Prince George's County Zoning Ordinance and the golf course was completed in the summer of 1962 as a part of the over-all plan for Tantallon by Theodore Robinson, the author of the over-all plan for the project.

After the organizational meeting of Isle of Thye, quarterly payments on account of principal and the semi-annual payments of interest were made by Isle of Thye. Triska testified that after the organizational meeting, he had no personal or individual interest in the project (apart from his home) and that he had no further dealings with Dr. Whisman other than in his capacity as President of Isle of Thye. Triska required Isle of Thye to perform all the obligations which he had to Dr. Whisman under the contract. He further testified that Dr. Whisman "always knew that it [the Whisman property] was going to be transferred into a corporation * * * he knew it was going to be a corporation." Dr. Whisman at one time had requested Isle of Thye to delay an interest payment in that he had too much income during the particular period and wanted a delay in payment until the next quarter. Isle of Thye agreed to do this. In its letter of October 15, 1963, Isle of Thye confirmed its willingness to defer the quarterly interest of $3,153.00, as well as the principal payments due in October and December. The letter further states:

> "The reason I am writing this letter is that our lender wants to have some notification to you that we were prepared to meet our payments."

The letter is signed by Triska, "President, Isle of Thye Company."

Cook, by an agreement made "as of" September 9, 1964, sold to Triska and Thompson capital stock in Isle of Thye and his interest in the Isle of Thye note.

On September 30, 1964, at a special meeting of the directors and stockholders of Isle of Thye, all directors and officers resigned, their resignations were accepted and Triska, Thompson and Justine A. Straus were elected directors. Triska was elected President; Thompson, Sec-

retary-Treasurer and Straus, Assistant Secretary. An offer of Triska and Thompson to obtain a new loan to refinance existing obligations of the corporation and to sell existing deferred purchase money notes received by the corporation for the sale of lots was accepted. The president and secretary were authorized, on behalf of Isle of Thye, to form a new Maryland Corporation to be known as Prestwick, Inc., Triska and Thompson to take the stock in the new corporation in their individual names as between them and the corporation and third parties, but as between them and Isle of Thye as nominees for Isle of Thye so that it would be the sole owner of all issued and outstanding stock of Prestwick and to vote such stock to obtain a loan from Continental Mortgage Investors, a Massachusetts business trust (Continental) in the amount of $4,500,000.00 with the understanding that Isle of Thye should convey all of its property and assets to Prestwick in exchange for all of its capital stock with the further understanding that Triska and Thompson should transfer the stock of Prestwick to Isle of Thye, subject to such pledge agreements as it might make in connection with obtaining such loan agreement.

The purpose of the transfer to Prestwick was to obtain a "clean" corporation for Continental who insisted upon this as a condition precedent to making the loan.

Prestwick had already been incorporated by Gilmore and on September 30, 1964, Isle of Thye, by Triska as President, executed a deed conveying all of the land it then owned, including the Whisman tract, to Prestwick. Isle of Thye, however, did not prepare and file for record with the State Department of Assessments and Taxation articles of sale, lease, exchange or transfer.

As we have indicated, Dr. Whisman died on October 7, 1964. Under the agreement between Continental and Prestwick, the outstanding obligation to Dr. Whisman was required to be paid. Nylen, acting for Prestwick, made inquiry of James M. Earnest, then administrator *ad colligendum* of the estate of Dr. Whisman, who asked Nylen for a written acknowledgement that the agree-

ment made by Dr. Whisman with Triska was binding on Prestwick. He offered to exchange a renunciation of his interest in the deed of trust note and a deed of release for the balance due on the note and the corporate acknowledgement of Prestwick. Nylen undertook by a letter of October 27, 1964, to do this, thinking he would be able to do this, but in the end, furnished Earnest only with an acknowledgment made by Triska which Nylen had prepared for Triska's signature. Triska, however, then President of Prestwick, testified that he did not understand that this document applied to himself alone, but believed that "Prestwick was obligated for the $100,000." Earnest accepted the document tendered and the check for $92,330.42, the balance due on the note.

As already pointed out in the contract of June 14, 1960, Dr. Whisman had reserved approximately six acres for himself and had given the purchaser, should Dr. Whisman elect to sell the six acre tract, an option to buy it for $3,000.00 an acre. This option ran for five years and thereafter the purchaser had a right of first refusal in connection with a sale of the six acre parcel by Dr. Whisman. Although Isle of Thye needed the six acre tract to complete certain lots, Dr. Whisman was unwilling to sell the tract. After his death, Triska, as President of Prestwick, submitted an offer to purchase the six acre parcel at approximately the option price suggested by Dr. Whisman in the contract. A subsequent offer was made by Prestwick on June 9, 1965.

In September, 1965, the interest which Triska and Thompson had in the Tantallon project was terminated.

The apartment project contemplated by the contract of June 14, 1960, as amended by the contract of September 14, 1960, has not been built (caused, in part, by the adverse zoning decision in *MacDonald, supra*) and the additional compensation due Dr. Whisman under these agreements has not been paid to him or to his estate.

When September 14, 1966 (six years after the amendatory agreement of September 14, 1960) had come and the apartment project had not been erected, the admin-

istratrix of Dr. Whisman's estate, through counsel, made demand upon Isle of Thye, Prestwick and Triska for performance of the contract. Gilmore, on November 22, 1966, acknowledged receipt of the letters from counsel for the administratrix to Prestwick and Isle of Thye in regard to the contract and stated that:

> "Our files indicate that an agreement did exist between Mr. Whisman and Mr. Triska but we do not believe these corporations are obligated thereunder." A copy was sent to Triska "so he will know of its content."

The administratrix promptly filed her suit on November 23, 1966.

The trial court found that Triska was a promoter; that Isle of Thye had adopted and ratified the preincorporation contract, including the agreement to pay the additional compensation; that Triska as a promoter whose contract had been adopted and ratified by Isle of Thye was not personally liable on the obligation and dismissed the bill of complaint as to Triska; that Prestwick was transferee of all of the assets of Isle of Thye and was now the operating corporation and succeeded to the obligations of Isle of Thye; and that if the plaintiff administratrix elected the money option, interest would run from the date of her election. The final decree, as we have already indicated, effectuated the trial court's findings and conclusions.

We have concluded that the trial court correctly held that Triska was a promoter; that Isle of Thye adopted and ratified the Whisman-Triska contract, thereby becoming bound to perform its obligations after which adoption and ratification Triska was no longer personally liable; and, that Prestwick also became bound to perform the obligations under the contract. In our opinion, however, the trial court erred in dismissing the bill of complaint as to Triska and should have instead made a declaration that Triska had no personal liability under the contract. The trial court also erred in regard to the

declaration concerning the allowance of interest. We will modify the decree of February 22, 1971, in these two regards and, as modified, affirm it.

Our predecessors in *Maryland Apartment House Co. v. Glenn,* 108 Md. 377, 70 A. 216 (1908) enunciated the rule applicable to the present case. In *Maryland Apartment House,* the promoters for a corporation to be formed to build and operate an apartment house in Baltimore City employed Glenn, the appellee in that case, to arrange for a loan of $70,000.00 from a bank to be secured by a mortgage on the apartment house property, agreeing to pay him a commission of $2\frac{1}{2}\%$ of the amount of the loan obtained. Glenn did arrange for the loan which was accepted by the corporation when formed which also duly authorized the mortgage to secure the loan. Glenn sued the corporation to recover his commissions and obtained a verdict and judgment against the corporation for their amount. In affirming the judgment, Judge Briscoe, for the Court, citing with approval *Bells Gap Railroad Co. v. Christy,* 79 Pa. St. 59, stated:

> "* * * when the projectors of a company enter into contracts in behalf of a body not existing at the time, but to be called into existence afterwards then if the body for which the projectors assumed to act does come into existence, it cannot take the benefit of the contract without performing that part of it which the projectors undertook that it should perform. And if such acts are necessary to the organization and its objects and are subsequently accepted by the company and the benefits thereof enjoyed by them, they must take such benefits *cum onere* and make compensation therefor."
>
> (108 Md. at 390, 70 A. at 218.)

We cited *Maryland Apartment House* with approval and followed it in *Rosenberg v. Rolling Inn, Inc.,* 212 Md. 552, 129 A. 2d 924 (1957). *Rosenberg* has several

similarities to the instant case. There, the corporation to be formed took over the real and personal property pursuant to a contract made by three individuals who, with others, became the corporation's first stockholders. The property was subject to an unrecorded mortgage which had been lost. The president of the newly formed corporation testified that when he bought his stock in the corporation, before he became president, he knew that the corporation owed the balance due on the mortgage and, as president, he was aware that the corporation regularly made payments on the mortgage and the corporate records showed such payments. The lower court in *Rosenberg* found for the defendant corporation on the ground that the alleged oral promise to pay the mortgage debt was to answer for the debt of another and thereby violated the Statute of Frauds, 29 Car. 2, Cap. 3, Section IV (2), 2 Alexander's "British Statutes in Force in Maryland" (Coe's Ed.) pages 689-90, there being an insufficient memorandum signed by the party to be charged. In reversing the lower court and entering judgment for the appellants and plaintiffs below for the balance due on the mortgage and interest, Judge (now Chief Judge) Hammond, for the Court, after pointing out that the Statute of Frauds did not apply because the promise was made to the debtor and not to the creditor and, in any event, the main purpose was to benefit the promisor not to answer for *another's* debt, stated:

> "We find it entirely clear from the record that Rolling Inn, Inc. ratified the contract made by the three individuals who became its first stockholders with the Eatons and Villa Donna, Inc., by taking over the real and personal property transferred pursuant to the contract and using them in the conduct of its business, and that in so doing it accepted not only the benefits but assumed the obligations of that contract, including the promise to the Eatons and Villa Donna, Inc. to pay the mortgage debt due Rosenberg

and Kaminsky. ' "When, however, the contract is made in the name or in behalf of the projected corporation, or is treated as a proposal to such corporation, then in the absence of other controlling circumstances, acceptance of benefits under the contract justified the inference that the corporation has accepted or adopted it." ' *Md. Apartment House Co. v. Glenn,* 108 Md. 377, 389."

(212 Md. at 555-56, 129 A. 2d at 925-26.)

Recently, we cited both *Maryland Apartment House* and *Rosenberg* with approval and followed them in *Real Estate Central, Inc. v. Kramer,* 254 Md. 290, 255 A. 2d 81 (1969) in which Judge McWilliams, for the Court, stated:

> "REC's [Real Estate Central, Inc., the appellant and newly formed corporation] final contention is that because the contract was made with Gibson it is not liable. Gibson formed the corporation in March, 1967. He has been its president from the outset. It has long been held that when a 'contract is made in the name or in behalf of the projected corporation, or is treated as a proposal to such corporation, then in the absence of other controlling circumstances, acceptance of the benefits under the contract justified the inference that the corporation has accepted or adopted it.' *Rosenberg v. Rolling Inn, Inc.,* 212 Md. 552, 555-56, 129 A. 2d 924, 925-926 (1957); *Maryland Apartment House Co. v. Glenn,* 108 Md. 377, 389, 70 A. 216 (1908); 18 Am.Jur.2d *Corporations,* §§ 119-22 (1965). Kramer's services benefited REC and some of the things he worked up were used by it after its incorporation. His frequent contacts with Gibson continued without significant change. REC made use of his services after it came into existence and, in fact made a change

in the manner of his compensation."
(254 Md. at 293-94, 255 A. 2d at 83.)

The Maryland law is in accord with the law generally. See 1 *Fletcher, Cyclopedia Corporations* (1963 Rev. Vol.), § 205, page 794; 18 Am.Jur.2d *Corporations,* § 119, page 661 and 18 C.J.S. *Corporations,* § 122 (b), pages 524-25.

There was ample evidence in the record to support the findings of Judge Mathias that Triska was a promoter and that Isle of Thye, the subsequently formed operating corporation, had accepted the benefits of the Whisman-Triska contract, had ratified it and was bound by its obligations.

In considering the findings of fact by the lower court, sitting without a jury, Maryland Rule 886 provides that we will not set aside the judgment of the lower court on the evidence "unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." See *Real Estate Central, Inc. v. Kramer, supra.* Judge Mathias stated in his Memorandum and Opinion on this point:

"It is rather apparent from the evidence in this case that Ralph Triska was in fact a promoter for the corporation, Isle of Thye Land Company. Isle of Thye was formed only five (5) months after the Triska-Whisman contract. Mr. Gilmore of the firm of Nylen and Gilmore who did the legal work of the Isle of Thye Land Company, specifically testified that any such contracts made by Mr. Triska in connection with Tantallon were for and on behalf of Isle of Thye. It is also a known fact that Triska was acquiring several tracts of land at the time he acquired the Whisman tract and that Dr. Whisman was knowledgeable as to Triska's plans. As soon as financing became available Triska and Cook sold all of their interest including the Whisman tract to Wallace Investments, Inc.,

who then sold everything to Isle of Thye. Once Isle of Thye took over the project, they not only enjoyed all the benefits of the Triska-Whisman contract but also sought to discharge the obligations thereunder. This obviously indicates that Isle of Thye adopted and ratified such contract executed by Triska and Whisman. The mere fact that Isle of Thye started development of the Whisman tract as soon as financing was available indicates that they were willing to accept the benefits of the Triska-Whisman contract. It has long been held that when a 'contract is made in the name of or in behalf of the projected corporation, or is treated as a proposal to such corporation, then in the absence of other controlling circumstances, acceptance of benefits under the contract justifies the inference that the corporation has accepted or adopted it.' *Real Estate Central v. Kramer,* 254 Md. 290, 293-294 (1969) ; *Rosenberg v. Rolling Inn, Inc.,* 212 Md. 252, 555-556 (1957) ; *Maryland Apartment House Co. v. Glenn,* 108 Md. 377, 387 (1908). Here we see that the law in Maryland is clear that where a corporation adopts or ratifies a contract made prior to its incorporation or organization, then that corporation is bound by that contract and for this reason we must find Isle of Thye liable under the Triska-Whisman contract."

It may be added to this statement by the lower court —with which we fully concur—that Gilmore stated on cross-examination that Triska and Cook "were the promoters of this project." Isle of Thye, after it had assumed the control and management of the Tantallon project, promptly availed itself, through its subsidiary corporations, of the right reserved to the purchaser and his assignees to construct capital improvements on the unreleased land. In our opinion, the findings of fact by

the lower court were well supported by the evidence and were most certainly not "clearly erroneous." His conclusions that Triska was a promoter and that Isle of Thye was bound to perform the obligations under the Triska-Whisman contract were correct.

The administratrix also urges several alternative theories upon which to support the lower court's declaration that Isle of Thye and Prestwick are bound to perform the obligations under the contract, *e.g.* equitable assignment, novation, and vendor's lien. Although there is possible merit in these alternative theories, we do not find it necessary to pass upon them in view of our opinion that the lower court was correct upon the theories upon which it predicated a declaration of liability in the instant case.

The appellants contend that, in any event, the promise or agreement by Isle of Thye to pay the Triska obligation is an oral contract to pay the debt of another and violates the Statute of Frauds. This contention has been resolved adversely to the appellants by our decision in *Rosenberg v. Rolling Inn, supra.*

In our opinion, the lower court correctly concluded that Triska was not personally liable under the Triska-Whisman contract after Isle of Thye, as the newly formed corporation, adopted and ratified the contract and became liable for the performance of its obligations.

In 1 *Fletcher, Cyclopedia Corporations,* Sec. 215 at page 838 (1962), it is stated:

> "The liability of promoters in a contract entered into by them will depend upon the terms of the contract and the intention of the parties. They are not personally liable if it is understood that the other party shall look to the corporation only * * *."

Professor Williston in 2 *Williston on Contracts,* Sec. 306 at page 430 (1959) explains the reason for the rule as follows:

> "* * * Although the cases generally speak of

the obligation of the corporation as created by adoption, novation may be the more accurate term * * *.

"[I]t seems more nearly to correspond with the intentions of the parties to suggest that when the corporation assents to the contract, it assents to take the place of the promoter — a change of parties to which the other side of the contract assented in advance. There would be a novation which would discharge the promoter at the same time the corporation assumed the obligation."

(Citations omitted.)

See also annotation, "Personal Liability of Promoter to Third Person on or With Respect to Contract Made for Corporation or in Aid of Promotion," 41 A.L.R.2d 515-17, 18 C.J.S. *Corporations,* pages 531-32 and *Marconi's Wireless Tel. Co. v. Cross,* 16 Hawaii 390 (1905) ; *J. H. Lane & Co. v. United Oil Cloth Co.,* 103 App. Div. 378, 92 N.Y.S. 1061 (1905) ; and *In Re Heckman's Estate,* 172 Pa. 185, 33 A. 552 (1896).

The evidence supports the conclusions that Dr. Whisman understood that when a controlling and managing corporation was formed, he would look to it for the performance of the contractual obligations. Triska's testimony indicates this and, indeed, the contract documents of June 14 and September 14, 1966, indicate this also inasmuch as one of the options given Dr. Whisman was the acquisition of a stock interest in the corporation "controlling the overall development of the project." Then, too, the mortgage payments were made by Isle of Thye and not by Triska. Dr. Whisman negotiated with Isle of Thye for postponement of payments of principal and interest due under the mortgage.

In our opinion, however, the *form* of the relief given Triska by the *decree* of February 22, 1971, *i.e.,* dismissing the bill of complaint as to Triska was improper. See *Downing Development Corp. v. Brazelton,* 253 Md. 390, 394-95, 252 A. 2d 849 (1969).

This portion of the decree should have read:

"ADJUDGED, ORDERED and DECREED, for the reasons set forth in the aforegoing Memorandum and Opinion dated October 14, 1970, that Ralph F. Triska was a promoter and that he has no personal responsibility or liability under the provisions of the contract made June 14, 1960, between James J. Whisman, now deceased, and Ralph F. Triska, as amended by the later contract made 'as of' September 14, 1960, by the same parties, the provisions thereof being declared to be binding upon the corporate defendants, Isle of Thye Land Company and Prestwick, Inc., as hereinafter set forth."

Although the result is the same, we think that declaratory relief on this issue having been prayed and decided, a declaration on the issue should be made in the decree.

We will now consider whether the trial court correctly held that Prestwick, as transferee of all of the assets of Isle of Thye, was bound by the obligations of the contract adopted and ratified by Isle of Thye. In our opinion, this holding was correct.

We may first observe that in our opinion Isle of Thye still remained liable to perform the obligations of the Triska-Whisman contract, adopted and ratified by it, even though it purported to transfer all of its assets to Prestwick on or about September 30, 1964.

It was stipulated that Isle of Thye did not prepare and file with the State Department of Assessments and Taxation, articles of sale, lease, exchange or transfer following the purported transfer of all of its assets to Prestwick on September 30, 1964. Code (1957), Art. 23, § 66 (i), as then applicable, provided:

"A consolidation of corporations to form a new corporation of this State, or a merger of one or more corporations of this or another state or states into a corporation of this State, or a

transfer of property and assets of a corporation of this State, shall be effective when the articles of consolidation, merger or transfer have been accepted for record by the Commission."

We have indicated that compliance with Article 23, § 66 is necessary for there to be an effective sale of all or substantially all of the assets of a Maryland corporation. See *Downing Development Corp. v. Brazelton,* 253 Md. 390, 252 A. 2d 849 (1969), *supra* and *Prince George's Country Club v. Edward R. Carr, Inc.,* 235 Md. 591, 202 A. 2d 354 (1964). Isle of Thye still remains liable to perform the obligations of the Triska-Whisman contract notwithstanding its attempted transfer of all of its assets to Prestwick.

In any event, however, Prestwick is also liable to perform the obligations of the contract inasmuch as Dr. Whisman's estate was a creditor of Isle of Thye on the date of the transfer to Prestwick; and Article 23, § 72 (2) as it was in effect on the day of the transfer provided:

"The debts and obligations of the transferor shall be assumed by the transferee to the extent, if any, provided in the articles; but regardless of the terms of the articles, no such sale, lease, exchange or transfer shall impair the rights of any creditor of the transferor, including any rights under the Sales in Bulk Act."

Moreover, the lower court properly determined that Prestwick, like its predecessor corporation — Isle of Thye—assumed the obligation under the contract when Prestwick attempted to exercise the options reserved under the contract to acquire Dr. Whisman's reserved six acre tract. The lower court also properly found that Triska's knowledge of the contract and its obligations should be imputed to Prestwick, then substantially his alter ego. See *Gribble v. Stearman & Kaplan, Inc.,* 249 Md. 289, 296, 239 A. 2d 573, 577 (1968).

Finally, we are of the opinion that the lower court erred in declaring that in the event the administratrix elects to take the sum of $100,000.00, she should have judgment for that amount *with interest from the date of her election.*

The applicable Maryland law in regard to the allowance of interest was aptly summarized by Judge McWilliams, for the Court, in *Atlantic States Construction Co. v. Drummond & Co.*, 251 Md. 77, 85, 246 A. 2d 251, 255 (1968), as follows:

> "Ordinarily the matter of interest is left to the discretion of the jury or the court sitting without a jury. In *Affiliated Distillers Brands Corp. v. R. W. L. Wine & Liquor Co.*, 213 Md. 509, 516, 132 A. 2d 582 (1957), we said:
>
>> 'However, this general rule is subject to certain exceptions that are as well established as the rule itself. Among the exceptions are cases on bonds, or on contracts, to pay money on a day certain and cases where the money has been used. If the contractual obligation be unilateral and is to pay a liquidated sum of money at a certain time, interest is almost universally allowed from the time when its payment was due. [Citing cases.]'
>
> To the same effect *see Mullan Contracting Co. v. International Business Machs. Corp.*, 220 Md. 248, 151 A. 2d 906 (1959)."

See *St. Paul At Chase Corp. v. Manufacturers Life Ins. Co.*, 262 Md. 192, 278 A. 2d 12 (1971); *The Kasten Construction Company, Inc. v. Anne Arundel County, Maryland*, 262 Md. 482, 278 A. 2d 282 (1971). See also 47 C.J.S. *Interest*, §§ 6 and 7, pages 17 and 19.

The contract expressly considered the payment of interest on the $100,000.00 computed from September 14, 1966, upon deferred payment of the $100,000.00 if elected by Dr. Whisman or by his executors, administrators or assigns. The contract contemplates that there be a rea-

sonable time within which to make the election but that any election when made would date *as of* September 14, 1966. The administratrix made a reasonable effort through counsel to obtain from Isle of Thye and Prestwick a recognition of her right to elect, but such a right was denied and refused by both corporations. The administratrix then promptly brought the present suit for declaratory relief. In short, the postponement of the election under the contract has resulted from the denial of that right by the two corporations; and this caused the postponement of the time of payment of the $100,000.00, if elected, during which time Prestwick (or Isle of Thye) had the use of the money. In view of the *express provision* in the contract for the payment of interest at 6% upon unpaid balances "computed from September 14, 1966," we are of the opinion that if the payment of the $100,000.00 is elected by the administratrix within 10 days after the receipt of the mandate in the lower court, she will be entitled to judgment for the $100,000.00 together with interest at the rate of 6% per annum from September 14, 1966. The decree of February 22, 1971, will be accordingly modified in regard to the allowance of interest.

> *Decree of February 22, 1971, modified in regard to a declaration concerning the personal liability of Ralph F. Triska and in regard to the allowance of interest as set forth in the aforegoing opinion and, as modified, affirmed, the costs to be paid by the appellants.*