WOLFE ET AL. *v.* WARFIELD ET UX.

[No. 24, September Term, 1972.]

*Decided November 8, 1972.*

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Edward H. Kerman* for appellants.

*E. Richard McIntyre* for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Appellants solicit the reversal of an adverse judgment ($16,544.11) of the Circuit Court for St. Mary's County, the end result of a tedious squabble between an obstetrician and a contractor. We shall not disturb the findings of Chief Judge Dorsey (retired 15 July 1971) before whom, sitting without a jury, the case was tried.

Early in 1965 Dr. Warfield, one of the appellants, commissioned Elkan Groll, a Silver Spring architect, to prepare plans and specifications for a house to be built on a 14 acre tract in the easternmost corner of Montgomery County, about three miles northwest of the town of Laurel in neighboring Prince George's County. Groll thought the house he had designed should cost between $82,000 and $89,000. The appellee Wolfe, among others, was invited to bid. Groll thought Wolfe's bid of $61,000 "was pretty low" and he doubted the job could be accomplished at that price. He understood Wolfe was trying to break into "the field of general contracting" and that this would be his "first job." He so advised Warfield but Wolfe reassured them that his bid was sound. Wolfe testified he referred to the specifications in arriving at the $61,000 figure but that he paid little or no attention to them because "had [he] gone by the specifications it would have cost much greater to do the job. There is no question about that." He said that was why he "made sure in the contract" to specify "*drawings* and not specifications." (Emphasis added.)

The contract, to be sure, is unusual. Dated 3 July 1967 it is between the Warfields ("Owner") and Arnold Wolfe,

Inc. ("Contractor"). The "Contractor" agreed to "furnish all of the materials and perform all of the work shown in the drawings . . . prepared by" Groll. It is true that the word "specifications" does not appear in the contract but the plans (drawings) contain at least four references to the specifications which, incidentally, were received in evidence without objection.

Wolfe began the construction of the house in mid-July. A week or so later he proposed to Ginsburg that he become a joint entrepreneur. Ginsburg agreed and by the end of August the Articles of Incorporation of Wolfe-Ginsburg Const., Inc., had been filed. What their respective interests were is not disclosed but it is not suggested there were other interested parties. Both Wolfe and Ginsburg participated in the supervision of the job.

Trouble developed soon enough. Early in August it was discovered that some 30 brick piers had been omitted from the basement walls. Groll wrote to Ginsburg on 7 August. What follows is an excerpt from his letter:

> "On an inspection on 6 August 1967 of the construction work, it was noted among other items that the brick piers, in every instance as called for on the drawings, were not provided and that wood beams were used in lieu of the steel beams as indicated.

> "Had the brick piers been constructed no need for bearing plates would have been necessary. It is directed that the following work be provided for adequate structural support or we are not responsible for any damage which might occur due to your failure to follow the drawings:

> "1. Provide 12" × ¾" × 12" bearing plates under the 12 WF 27 beam in the basement.

> "2. Provide the 10 WF 25 beam over Bath No. 2 and Dressing Room as called for with 8" × ⅝" × 11" plates.

> "3. Provide the 8 WF 24 beam over the bow

window in the living room as called for with 8″
× ⅝″ × 11″ plates.

"4. Provide the 8 WF 17 beam over the din-
ing room opening as called for with 8″ × ⅝″
× 10″ plates."

Not long thereafter it was discovered that an inferior
grade of lumber was being used. On another occasion
the absence of other brick piers was discovered. Warfield
testified that by mid-November there was an accumula-
tion of "some 60 odd deficiencies." He said either they
had not been corrected, or they had been corrected only
as a stopgap. He "had just reached the point where . . .
[he] was either going to have to take the house and blow
it up and start from scratch or try and salvage what
[he] had left." On 22 November he sent to Wolfe the
letter which follows:

"This is to notify you that we hereby declare
a general breach on your part of our contract
with you dated July 3, 1967 in accordance with
plans and specifications drawn by Elkan W.
Groll & Associates, date May 1967.

"There have been a number of acts consti-
tuting your breach, some of which are:

"1.) Failure to comply structurally with
plans such as bearing piers, terra
cotta drain tile covered by 12 inches
of gravel around footings, ash dump
left out of fireplace in basement, all
wiring in walls and ceilings to be ar-
mored cable.

"2.) Definite attempt to defraud by having
contracts with subcontractors to pro-
vide lesser substitutes for materials
and fixtures than those indicated in
plans and specifications, without con-
sultation with, or approval of, owner
and architect.

"3.) Causing unnecessary delays, and errors in construction, due to complete lack of supervision during construction.

"Please remove forthwith from the premises known as Spring Lake Farm, 15620 Riding Stable Road, Laurel, Maryland by the following date and time:

"12 o'clock noon, Saturday, November 25, 1967."

On 10 April 1968 Warfield sued the appellants in the Circuit Court for Montgomery County claiming damages in the amount of $75,000. The appellants in their counterclaim demanded $50,000 damages. After extended discovery activities the case was ordered removed to the Circuit Court for St. Mary's County where it was tried on 14 and 27 January 1971. We shall deal with the appellants' contentions in the order in which they appear in their brief.

## I.

In his opinion Judge Dorsey referred "to the various and sundry eliminations, substitutions and overall failures to comply with the strict requirements of the specifications which were *incorporated by reference* to the contract." (Emphasis added.) Appellants, insisting "[t]here is no scintilla of evidence which would even point to, let alone support" such a conclusion, assign reversible error. This is a bold assertion but it is not plausibly maintained; nor is there a citation of authority in support thereof. The contract required Wolfe to "furnish all of the materials" as well as to "perform all of the work shown on the drawings." As we have said the drawings, in at least four places, refer to the specifications and it is in the specifications that the complete list of the materials will be found. It can hardly be supposed that Warfield and Groll contemplated a structure in which would be used only Wolfe's choice of materials. Such an

arrangement is conceivable where the contractor's compensation is on a cost plus basis, but where, as here, the contract provides for the payment of a lump sum it would be both unwise and imprudent to allow the contractor such latitude. Indeed, Wolfe's testimony exposes his intention to use cheaper materials wherever possible.

While there seems to be a dearth of meaningful authority in this regard we think the word "drawings," as used in these plans, necessarily includes "specifications" and we so hold. Indeed, to hold otherwise would be akin to producing *Hamlet* without Hamlet.

## II.

Appellants next contend that Judge Dorsey's finding that there had been a breach of the contract sufficiently material to justify rescission was clearly erroneous. Our study of the record persuades us that there was an abundance of evidence supportive of Judge Dorsey's conclusion and we do not think any useful purpose will be served by a recital of it in detail. Certainly we cannot say that his finding of fact was clearly erroneous nor that he misapplied the law. Maryland Rule 886.

## III.

Error is assigned in respect of the damages awarded. Again we think it is clear that the evidence supports the award and that the finding is not clearly erroneous. Rule 886.

## IV.

Appellants declare "it defies comprehension that the court found liability on the part of *all* defendants." They argue that if Wolfe and Ginsburg are liable as promoters then the corporation must be absolved and that, conversely, if the corporation is held they, as individuals, must be acquitted. They rely exclusively upon *Cranson v. International Business Machines Corp.,* 234 Md. 477, 200 A. 2d 33 (1963). We think such reliance is ill-advised. *Cranson* presented a somewhat different situation.

The facts were stated by Judge Horney, who delivered the opinion of the Court:

"The agreed statement of facts shows that in April 1961, Cranson was asked to invest in a new business corporation which was about to be created. Towards this purpose he met with other interested individuals and an attorney and agreed to purchase stock and become an officer and director. Thereafter, upon being advised by the attorney that the corporation had been formed under the laws of Maryland, he paid for and received a stock certificate evidencing ownership of shares in the corporation, and was shown the corporate seal and minute book. The business of the new venture was conducted as if it were a corporation, through corporate bank accounts, with auditors maintaining corporate books and records, and under a lease entered into by the corporation for the office from which it operated its business. Cranson was elected president and all transactions conducted by him for the corporation, including the dealings with I.B.M., were made as an officer of the corporation. At no time did he assume any personal obligation or pledge his individual credit to I.B.M. Due to an oversight on the part of the attorney, of which Cranson was not aware, the certificate of incorporation, which had been signed and acknowledged prior to May 1, 1961, was not filed until November 24, 1961. Between May 17 and November 8, the Bureau purchased eight typewriters from I.B.M., on account of which partial payments were made, leaving a balance due of $4,333.40, for which this suit was brought.

\* \* \*

"The fundamental question presented by the appeal is whether an officer of a defectively in-

corporated association may be subjected to personal liability *under the circumstances of this case.* We think not." *Id.* at 479-80. (Emphasis added.)

We held in *Cranson* "that I.B.M., having dealt with . . . [Real Estate Service Bureau] as if it were a corporation and relied on its credit rather than that of Cranson, is estopped to assert that the Bureau was not incorporated at the time the typewriters were purchased." In the case at bar there is credible evidence that Warfield dealt first with Wolfe and next with Wolfe and Ginsburg. While he made payments to the corporation, at the request of Wolfe or Ginsburg, it does not appear that he ever indicated an intention to look to the corporation for performance to the exclusion of Wolfe or Wolfe and Ginsburg. In *Isle of Thye Land Co. v. Whisman,* 262 Md. 682, 701, 279 A. 2d 484, 494 (1971), Judge Barnes, quoting from *Real Estate Central, Inc. v. Kramer,* 254 Md. 290, 255 A. 2d 81 (1969), said for the Court:

"'REC's [Real Estate Central, Inc., the appellant and newly formed corporation] final contention is that because the contract was made with Gibson it is not liable. Gibson formed the corporation in March, 1967. He has been the president from the outset. It has long been held that when a "contract is made in the name or in behalf of the projected corporation, or is treated as a proposal to such corporation, then in the absence of other controlling circumstances, acceptance of the benefits under the contract justified the inference that the corporation has accepted or adopted it." *Rosenberg v. Rolling Inn, Inc.,* 212 Md. 552, 555-56, 129 A. 2d 924, 925-926 (1957) ; *Maryland Apartment House Co. v. Glenn,* 108 Md. 377, 389, 70 A. 216 (1908) ; 18 Am. Jur. 2d *Corporations,* §§ 119-22 (1965).'" 262 Md. at 701.

In *Crosse v. Callis*, 263 Md. 65, 71, 282 A. 2d 86 (1971), Judge Smith, in delivering the opinion of the Court, observed:

> ". . . Although a corporation may be liable for contracts made by promoters and adopted by the corporation as in *Isle of Thye Land Co. v. Whisman*, 262 Md. 682, 279 A. 2d 484 (1971), the promoter may remain individually liable for such contracts in the absence of an agreement that he is to be relieved of such responsibility. 1 *Fletcher, Cyclopedia Corporations* § 216 (1963 Rev. Vol.)." *Id.* at 71.

To the same effect *see* 18 Am. Jur. 2d *Corporations* § 131 (1965) ; 41 A.L.R.2d § 14 (1955).

Judge Dorsey held, correctly we think, in the circumstances, that "in the absence of any protective pre-incorporation contract, the promoter is not discharged of his personal liability by [the] subsequent adoption of the contract by the corporation; and in such cases both the promoter and the corporation are liable on the contract."

## V.

Finally appellants complain because the court failed to make an award of damages in respect of their counterclaim. We have not discovered in the record anything to suggest that Judge Dorsey made any finding in respect of the counterclaim. He did not mention it either in his opinion or in the judgment. Neither is it mentioned in the docket entries. However the omission matters not since, having affirmed the judgment against the appellants, we would have been obliged to affirm a judgment in favor of Warfield for costs had one been entered.

*Judgment affirmed.*
*Costs to be paid by the appellants.*