562 A.2d 1286
## BALTIMORE LUGGAGE COMPANY
v.
## Samuel J. HOLTZMAN.
### No. 1753 Sept. Term, 1988.

Court of Special Appeals of Maryland.

Sept. 1, 1989.

On Motion for Reconsideration, etc. Filed Nov. 15, 1989.

Certiorari Denied Jan. 10, 1990.

Robert A. Gordon (Goldstein and Sher, P.A., on the brief), Baltimore, for appellant.

Robert S. Glushakow (Nolan, Plumhoff & Williams, Chartered, on the brief), Towson, for appellee.

Argued before MOYLAN, ROSALYN B. BELL and ROBERT M. BELL, JJ.

ROSALYN B. BELL, Judge.

The Baltimore Luggage Company, a Rhode Island Corporation (Baltimore Luggage (RI)), appeals from a judgment of the Circuit Court for Baltimore County awarding Samuel J. Holtzman $72,176 for fringe benefits accrued under his employment agreement. Baltimore Luggage (RI) presents four issues:

—Had Baltimore Luggage (RI), as a successor corporation, assumed the obligations contained in Holtzman's 1975 employment agreement?

—Was Baltimore Luggage (RI) liable for the obligations of Holtzman's employment agreement under Maryland's Bulk Transfers Act?

—Should Holtzman have been estopped from claiming a contractual relationship with Baltimore Luggage (RI)?

—Assuming that Baltimore Luggage (RI) is liable for Holtzman's expenses by virtue of the employment agreement, did the trial court err in its calculation of damages?

We reverse based on the first two issues; hence, we need not and will not address the second two issues. We begin with a brief review of the relevant facts.

Baltimore Luggage began as a family business. Holtzman's father was chief executive officer until 1936 when Holtzman, the plaintiff in this action, took over in that capacity. Holtzman remained the chief executive officer of the company from 1936 until 1983.

In 1976, 100 percent of the stock of Baltimore Luggage was sold. The stock was ultimately wholly acquired by Carl Marks & Company, Inc. The acquiring company assumed both the name and business of Baltimore Luggage. This corporation, Baltimore Luggage (MD), later became a New York corporation known as Balt–Lug Divesting Corp. (Balt–Lug) and exists today. Holtzman continued as chief executive officer of Baltimore Luggage (MD) despite the change of ownership. On November 1, 1983, Baltimore Luggage (MD), then owned by Carl Marks & Co., Inc., sold its assets and liabilities to a Rhode Island corporation, which assumed the name and business of the Baltimore Luggage Corporation (MD). Robert Davidoff acted on behalf of Carl Marks & Co., Inc. in the transaction.

The sale of assets and liabilities of Baltimore Luggage (MD) was memorialized by an Agreement for Purchase and Sale of Assets. Holtzman was neither a party to, nor knew of this agreement. The agreement provided that Baltimore Luggage (MD) (as controlled by Carl Marks & Co.), the transferring company, would indemnify and hold the buyer harmless as against any obligations arising under Holtzman's employment agreement.[1] It was also agreed that the

---

1. The agreement provided in pertinent part:
 "Buyer agrees to assume all contracts with third parties related to the BALTIMORE LUGGAGE BUSINESS as disclosed in this Agreement *except Seller shall retain all liabilities for and indemnify and save Buyer harmless against any amounts now or hereafter due: (i) to Sam Holtzman on account of his employment agreement or any other agreement or arrangement between Sam Holtzman and Seller or Carl Marks or Carl Marks & Co., Inc. except for payment for actual services performed for Buyer after the Closing Date and until termination of such services either by Buyer or by Sam Holtzman* (regardless of whether such termination shall have been in accordance with such employment or other agreement)...." (Emphasis added.)

purchaser would waive compliance with the Bulk Transfers Act, §§ 6–101 et seq., Md.Com.Law Code Ann. (1975), presumably pursuant to § 6–103(6)[2] or (7)[3], although the actual contract is silent on this point.[4] There was therefore no notification to Holtzman or any other creditors that the company's assets were being sold. Holtzman learned of the transfer after the assets were already transferred. No articles of transfer were ever filed with the Maryland State Department of Assessment and Taxation.

The controversy in the instant case centers around Holtzman's employment agreement. He entered into the original agreement in July of 1975 with Baltimore Luggage (MD) to serve as its chief executive officer for a five-year period and, following this term, as a consultant and advisor to the company for five years. This agreement was amended and modified three times. On November 1, 1983, the date of the transfer of assets and liabilities, Holtzman's employment contract provided his employment as chief executive officer would terminate on the earlier of December 31, 1985 or 360 days following receipt of written notice by either party to end the term, whichever was earlier. The agreement also provided that Holtzman would remain on as a consultant for

---

**2.** Section 6–103, Transfers excepted from this Title, subsection

"(6) Transfers to a person maintaining a known place of business in this State who becomes bound to pay the debts of the transferor in full and gives public notice of that fact, and who is solvent after becoming so bound...."

**3.** Section 6–103, Transfers excepted from this title, subsection

"(7) A transfer to a new business enterprise organized to take over and continue the business, if public notice of the transaction is given and the new enterprise assumes the debts of the transferor and he receives nothing from the transaction except an interest in the new enterprise junior to the claims of creditors...."

We fail to see how either (6) or (7) would apply; however, this is not significant to our decision.

**4.** The contract provision:

"9.05 Bulk Sales Waiver. Buyer waives compliance with the provisions of the Bulk Sales Act (Article 6 of the Uniform Commercial Code) in reliance upon the representations and warranties of Seller and its covenants to perform its obligations hereunder."

five years, and would continue to receive his fringe benefits.[5]

Employees of Baltimore Luggage (MD) were informed of the sale and the appointment of Joseph Schuster as president and chief executive officer in a notice dated November 1, 1983 from Davidoff, the vice president of Carl Marks & Co. Holtzman neither received prior notice nor did Davidoff mention the transfer in a phone conversation with Holtzman on November 1. On November 4, 1983, Holtzman submitted his written resignation as chief executive officer to Davidoff in accordance with the terms of his employment agreement.

After the transfer of assets occurred, Carl Marks & Co. retained a stock interest in Baltimore Luggage (RI).[6] As earlier mentioned, the original Baltimore Luggage (MD) ultimately became known as Balt–Lug Divesting Corp.

A meeting between Davidoff and Holtzman took place on November 9, 1983 to discuss the asset transfer and its effect on Holtzman's employment agreement, including the continued payment of fringe benefits. Holtzman understood that his employment agreement would be honored in

---

5. The fringe benefits referred to are claimed to be the following:
 a. payment of the medical and dental bills for Holtzman and his wife;
 b. payment of 60 percent of Holtzman's country club dues;
 c. supply Holtzman with an automobile and pay all related expenses;
 d. payment of Holtzman's personal long distance calls;
 e. provide personal bookkeeping and secretarial services for Holtzman's other business interests;
 f. safe-keeping and storing of personal property belonging to Holtzman at no charge to him;
 g. provide luggage to Holtzman and his immediate family;
 h. provide a $25,000 life insurance policy, with the right of Holtzman to designate a beneficiary; and
 i. provide Blue Cross and Blue Shield health insurance for both Holtzman and his wife.

6. The actual percentage retained by Carl Marks & Co. is uncertain. Testimony obtained from two separate witnesses during the trial sets two different figures: 20 percent and 25 percent. It is unnecessary for our purposes that this issue be resolved.

all respects as noted by him in a letter dated November 22, 1983 to Davidoff.[7]

Payments for the assets were made regularly by Baltimore Luggage (RI) in accordance with the contract of sale. The payments to Holtzman were deducted by Baltimore Luggage (RI) from the regular payments being made to Balt–Lug. Holtzman continued to receive his contractual salary along with his existing fringe benefits for the 360–day period following his resignation. Regular deductions were made and were included in the W–2 furnished to Holtzman by Baltimore Luggage (RI).

At the conclusion of the 360–day termination period, Baltimore Luggage (RI) notified Holtzman in writing that the employment phase of the employment agreement was coming to a close and the monthly consultant's fee would be remitted each month until the contract expired.

Baltimore Luggage (RI) continued to pay Holtzman's fringe benefits during the consulting phase until February, 1985, at which time Davidoff instructed Baltimore Luggage's (RI) comptroller to discontinue paying the fringe

---

7. This letter forms the basis for the claim by Baltimore Luggage (RI) of estoppel and states in part:

"[Y]ou assured ... me that my employment agreement would be honored in all respects until its termination November 1989 in particular compensation and all existing fringe benefits including but not limited to the following fringe benefits:

All medical costs and dental costs for my wife and myself paid for by Baltimore Luggage.

Same percentage of Surburban [sic] Club charges to be paid for by Baltimore Luggage.

Car furnished to me by Baltimore Luggage, all repairs and expense's [sic] including fuel to be paid for by Baltimore Luggage. Office and reasonable secretary service supplied to me by Baltimore Luggage.

Long distance phone calls charged to Baltimore Luggage same as in the past.

"It has been brought to my attention that although the New Baltimore Luggage Co. is paying for my compensation and fringe benefits, they have not assumed the obligations of my employment agreement. Therefore, any monies paid to me and fringe benefits given to me by the new company will be credited against the continuing obligation of the Old Baltimore Luggage Co.

"I also want to thank you for agreeing to give me a $25,000.00 bonus for the past services rendered to Baltimore Luggage Co."

benefits. It is undisputed that Baltimore Luggage (RI) continues to pay Holtzman's monthly consultant's fee and provides Blue Cross and Blue Shield medical coverage for both Holtzman and his wife. These items are deducted from Baltimore Luggage's (RI) regular payments to Balt–Lug.

Balt–Lug, formerly Baltimore Luggage (MD), became a defunct Maryland corporation around October, 1985. It was not considered a legal entity in the State of Maryland, as recently as March 10, 1988. Apparently, prior to trial, it reincorporated and was, as of the trial, a New York corporation. Baltimore Luggage (RI) continues its business in the sale of luggage, although it has ceased manufacturing and is now an importer.

Holtzman filed his complaint in September, 1986, claiming that Carl Marks & Co. and Baltimore Luggage (RI) were obliged to continue paying his fringe benefits under his employment agreement.[8] Baltimore Luggage (RI) and its co-defendant, Carl Marks & Co., filed motions to dismiss and cross-motions for summary judgment. Marks's motion to dismiss was granted.

The issue before the trial court was whether or not Baltimore Luggage (RI) was, in fact, responsible under the initial employment agreement that Holtzman had with Baltimore Luggage (MD). There was no dispute as to the consultant fees. The only issue concerns payment of Holtzman's fringe benefits. The trial judge found the employment agreement binding upon Baltimore Luggage (RI) as a continuation of Baltimore Luggage (MD), concluding that Holtzman was a creditor of Baltimore Luggage (RI). A judgment in favor of Holtzman was entered in the amount of $72,176. It is from this judgment that Baltimore Luggage (RI) appeals.

We first discuss whether and when a successor corporation assumes the liabilities and obligations of its predecessor. Next, we discuss the applicability of Maryland's Bulk Transfers Act to the instant case. Finally, we discuss the predecessor corporation's capacity to sue or be sued in this case.

---

8. Suit was also brought against Balt–Lug, but that suit was dismissed prior to service.

## SUCCESSOR CORPORATION LIABILITY

Maryland Corps. & Ass'ns Code Ann. § 1–101(u)(4) (1975, 1985 Repl.Vol.), defines a successor corporation as a vendee, lessee or other transferee in a transfer of assets. A transfer of assets is any sale, lease, exchange or other transfer of all or substantially all of the assets of a corporation. § 1–101(v). Baltimore Luggage (MD) transferred all of its assets, with the possible exception of an automobile, to what would become Baltimore Luggage (RI) on November 1, 1983. Therefore, Baltimore Luggage (RI) is the successor corporation of Baltimore Luggage (MD). The next step is to determine whether Baltimore Luggage (RI), as a successor corporation, is liable for Holtzman's employment contract.

▪ The general rule of corporate liability is that, ordinarily, a corporation which acquires the assets of another corporation is not liable for the debts and liabilities of the predecessor corporation. There are, however, four exceptions to this general rule. The debts and liabilities of the predecessor corporation are imposed on the successor corporation when (1) there is an expressed or implied assumption of liability; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is a mere continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for debts. *Golden State Bottling Co. v. National Labor Relations Board*, 414 U.S. 168, 182–83 n. 5, 94 S.Ct. 414, 424 n. 5, 38 L.Ed.2d 388 (1973). *See* 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7122 (rev. perm. ed. 1983); 19 Am.Jur.2d, *Corporations* §§ 2704–2722 (1986).

While Maryland has not articulated the general rule of a successor corporation's liability, it is implicit in the Maryland statutes and case law. Insofar as the exceptions for consolidation or merger and fraud are concerned, Maryland has codified these exceptions. Maryland Corps. & Ass'ns Code Ann. § 3–114(e)(1) (1975, 1985 Repl.Vol., 1988 Cum. Supp.), provides that, when there is a consolidation or merger, the successor is liable for all the debts and obligations of each nonsurviving corporation. Additionally, the Maryland Uniform Fraudulent Conveyance Act, Md. Com.Law Code Ann. §§ 15–201 *et seq.* (1975, 1983 Repl.Vol., 1988 Cum.Supp.), implicitly recognizes that a successor cor-

poration may be held liable for the obligations of its predecessor. For example, § 15–209(a)(2) allows a creditor of the transferor to attach or levy on the property conveyed to the transferee, if the transfer is fraudulent.

No allegations regarding fraud or merger, however, were made by the parties nor do we find any evidence to establish these exceptions. Accordingly, we will only address whether exceptions (1) and (3) have been implicitly recognized in Maryland's case law or code and whether they apply in the case *sub judice.*

—Express Assumption of Liability—

Regarding the first exception, § 3–115(c)(1) of the Md. Corps. & Ass'ns Code Ann. (1975, 1985 Repl.Vol.), provides that a successor corporation is "liable for all the debts and obligations of the transferor to the extent provided in the articles of transfer." [9]

In the instant case, no articles of transfer were filed with the State Department of Assessments and Taxation. Holtzman argues, therefore, that the failure to file articles of transfer rendered Baltimore Luggage (RI) liable for his employment contract. Holtzman, however, provides us with no authority for this contention nor does he show in what way he was prejudiced by the failure to file.

In order to resolve this question, we must determine whose interests are protected by the filing of the articles of transfer. When there is a sale of substantially all of a corporation's assets, articles of transfer must be filed with the State Department of Assessments and Taxation. Md. Corps. & Ass'ns Code Ann. § 3–107 (1975, 1985 Repl.Vol.). The purpose of the filing requirement is to insure that creditors are properly informed of the sale of the debtor's assets. *Antigua Condominium Ass'n v. Melba Investors Atlantic, Inc.,* 307 Md. 700, 729, 517 A.2d 75 (1986).

 Unless the statutory requirements contained in Md. Corps. & Ass'ns Code Ann. §§ 3–101 *et seq.* are met, the sale of substantially all the assets of a Maryland corporation is ineffective as to creditors. *Prince George's Coun-*

---

**9.** Maryland Corps. & Ass'ns Code Ann. § 1–101(c) (1975, 1985 Repl. Vol.), defines articles of transfer as "articles of sale, articles of lease, articles of asset exchange, or articles of transfer."

*try Club, Inc. v. Edward R. Carr, Inc.*, 235 Md. 591, 596, 202 A.2d 354 (1964). Thus, where a corporation does not file the articles of transfer, as required by law, the transferor remains liable for the obligation assumed prior to the transfer. *Isle of Thye Land Co. v. Whisman*, 262 Md. 682, 706–07, 279 A.2d 484 (1971). In the instant case, the failure to file the articles of transfer would give Holtzman recourse against the transferor, Baltimore Luggage (MD) (now Balt–Lug), not Baltimore Luggage (RI).

■ Additionally, Holtzman was informed of the transfer of assets around November 2, 1983, the day after the Agreement for Purchase and Sale of Assets was dated. Even assuming that Holtzman is a creditor, we do not see how Holtzman was prejudiced by the failure to file the articles of transfer in light of the fact that he was fully informed of the transfer. Moreover, Title 3, Subtitle 1 of Md. Corps. & Ass'ns Art. imposes no limitation for compliance with filing the articles of transfer. Thus, Baltimore Luggage (RI) could still file the articles of transfer and be in compliance with the statute. *See Beccio v. Tawnmoore Apartments, Inc.*, 265 Md. 297, 303, 289 A.2d 311 (1972) (creditor of transferor corporation could not attack tardy compliance with articles of transfer statutes).

■ In the absence of articles of transfer, we conclude that the sales agreement would be equivalent to the articles of transfer. *See G.E. Frisco v. Aetna Ins. Co. of Hartford, Connecticut*, 235 Md. 472, 477, 201 A.2d 781 (1964) (chattel mortgage and assignment of lease equivalent to articles of transfer required under Md.Code Ann. Art. 23, § 72 (1957), now § 3–115 of Md.Corps. & Ass'ns Code Ann.). This being so, we look to the sales agreement to determine whether Baltimore Luggage (RI) intended to assume Holtzman's employment contract. Article 1.03.1B of that contract specifically states that the seller, Baltimore Luggage (MD), "*shall* retain all liabilities . . . to Sam Holtzman on account of his employment agreement. . . ." (Emphasis added.) Thus, it is clear from the sales agreement that Baltimore Luggage (RI) did not expressly assume the liabilities of Holtzman's employment contract.

—Implied Assumption of Liability—

Holtzman argues, however, that the instant transaction falls within the first exception because Baltimore Luggage (RI) impliedly assumed the obligations of his employment contract. Holtzman relies on *Isle of Thye Land Co. v. Whisman*, 262 Md. 682, 279 A.2d 484 (1971), to support his argument.

*Isle of Thye* involved the acquisition of a tract of land from Whisman by a promoter, Triska, who later formed a corporation known as Isle of Thye Land Co. Subsequently, Isle of Thye transferred all of its assets to Prestwick, Inc. without filing articles of transfer. When defaults occurred under the original contract of sale, the administrator of Whisman's estate demanded that Triska, Isle of Thye and Prestwick honor their contractual obligations and filed suit.

The Court of Appeals held that Triska was a promoter and that Isle of Thye had adopted and ratified the Whisman–Triska contract. Therefore, Isle of Thye became bound to perform the contractual obligations and Triska was no longer personally liable. *Isle of Thye*, 262 Md. at 698, 279 A.2d 484. The Court further held:

"... Prestwick [was] also liable to perform the obligations of the contract inasmuch as Dr. Whisman's estate was a creditor of Isle of Thye on the date of the transfer to Prestwick; and Article 23, § 72(2) [now Md.Corps. & Ass'ns Code Ann. § 3-115 (1985)] as it was in effect on the day of the transfer provided:

'The debts and obligations of the transferor shall be assumed by the transferee to the extent, if any, provided in the articles; but regardless of the terms of the articles, no such sale, lease, exchange or transfer shall impair the rights of any creditor of the transferor, including any rights under the Sales in Bulk Act.'

"Moreover, the lower court properly determined that Prestwick, like its predecessor corporation—Isle of Thye—assumed the obligation under the contract when Prestwick attempted to exercise the options reserved under the contract to acquire Dr. Whisman's reserved six acre tract. The lower court also properly found that Triska's knowledge of the contract and its obligations should be imputed to Prestwick, then substantially his alter ego."

*Isle of Thye,* 262 Md. at 707, 279 A.2d 484.

Thus, *Isle of Thye* implicitly recognizes the first exception to the general rule: a successor corporation may impliedly assume the obligations of its predecessor. The instant case, however, is distinguishable. The transfer of assets from Isle of Thye to Prestwick was a mere paper transaction to provide a "clean" corporation for the purpose of securing a loan. Prestwick was held by essentially the same owners as its predecessor, Isle of Thye. In the instant case, the transfer from Baltimore Luggage (MD) to Baltimore Luggage (RI) was an actual transfer of assets. The transfer occurred in an arms length transaction between two separate and distinct business entities whose owners are not identical.

Furthermore, since Triska acted as a promoter for both Isle of Thye and Prestwick, the Court found that the corporations were the alter egos of Triska. Thus, Triska's liabilities were imposed on Isle of Thye and Prestwick. Here, there was no promoter and thus no promoter liabilities to be imposed on a successor corporation. The obligations of Holtzman's employment contract were incurred by and remained the obligation of Baltimore Luggage (MD) (now Balt–Lug). The Agreement for Purchase and Sale of Assets did not transfer this liability to the buyer and thus Baltimore Luggage (RI) did not assume this liability.

Moreover, Prestwick received the direct and substantial benefits of the Triska–Whisman contract, namely the real estate assets. Additionally, Prestwick attempted to exercise its option to purchase additional acreage. Although Holtzman continued to perform certain duties during the termination phase of his employment contract, a new chief executive officer took over immediately. Baltimore Luggage (RI) never sought to exercise any of its options under that agreement, including the option to use Holtzman as a consultant. Thus, Baltimore Luggage (RI) never received a direct and substantial benefit from Holtzman's employment contract. While Holtzman did not compete, there was no testimony that Baltimore Luggage (RI) made any requests of Holtzman in this regard.

Finally, in *Isle of Thye,* Prestwick never represented to Whisman that Prestwick would not assume the obligations of his contractual agreement. Nor did Whisman have occa-

sion to confirm such an understanding. Holtzman, however, was aware that Baltimore Luggage (RI) did not and would not assume the obligations of his employment contract. Moreover, Holtzman confirmed his understanding of this situation in his letter of November 22, 1983. Thus, we hold the facts of the instant case do not fall within the exception as outlined in *Isle of Thye*.

■ Holtzman also alleges that the conduct of Baltimore Luggage (RI) after the asset transfer constitutes an implied assumption of his employment contract. In order for a promise to be implied on the part of a corporation to pay the debts of another corporation, the conduct or representations relied upon by the party asserting liability must indicate an intention of the buyer to pay the debts of the seller. The presence of such an intention depends on the facts and circumstances of each case. 15 W. Fletcher, *supra* § 7124.

In the instant case, Holtzman cites the following as evidence of Baltimore Luggage's (RI) intention to pay his contract:

A. Baltimore Luggage (RI) paid a $25,000 bonus to Holtzman in November of 1983.

B. Baltimore Luggage (RI) paid Holtzman his contractual salary as chief executive officer from November 1, 1983 through November 4, 1984.

C. Baltimore Luggage (RI) considered Holtzman to be its employee by issuing W–2 wage and tax statements to Holtzman for 1983 and 1984.

D. Prior to entering into the advisory and consultative phase of the employment agreement, Baltimore Luggage (RI) paid for all of Holtzman's fringe benefits.

E. Baltimore Luggage (RI) notified Holtzman on November 1, 1984 that the initial phase of his contract expired and he was once again assured by Baltimore Luggage (RI) that he would continue to receive his monthly consultant's fee of $3,125 "until the contract expires." This notification coincided directly with the express termination provision of Holtzman's employment agreement.

F. Baltimore Luggage (RI) continued to pay Holtzman's fringe benefits during the advisory and consultative phase of his employment agreement through February, 1985.

G. Baltimore Luggage (RI) continues to pay Holtzman his monthly consultative's fees in the amount of $3,125.

H. Baltimore Luggage (RI) continues to provide Blue Cross and Blue Shield medical coverage.

Although these facts could be interpreted to support an intention to assume Holtzman's employment contract, the circumstances under which these payments were made negate any such interpretation. We explain.

The record clearly indicates that, although payments were made by Baltimore Luggage (RI) to Holtzman, those payments were in turn deducted from the payments by Baltimore Luggage (RI) to Balt–Lug for the purchase of the assets. In essence, Baltimore Luggage (RI) was reimbursed by Balt–Lug for the payments made to Holtzman. Moreover, Holtzman, himself, never considered that Baltimore Luggage (RI) assumed the obligation for his contract. This is evidenced by his letter dated November 22, 1983 in which he acknowledged that Baltimore Luggage (RI) would pay his consulting fees on behalf of Baltimore Luggage (MD), but Baltimore Luggage (RI) had not assumed the obligation of his employment agreement. In conclusion, we hold that there was neither an express nor implied assumption of liability by Baltimore Luggage (RI) of Holtzman's employment agreement.

—Mere Continuation Exception—

■ The third exception to the general rule of nonliability occurs where the successor corporation is a mere continuation of the seller.[10] Although this exception is not codified or adopted in Maryland case law, the policy behind this exception, as well as the other exceptions, permeates the Corps. & Ass'ns and the Com.Law Articles. *See, e.g.,*

---

**10.** Baltimore Luggage (RI) relies on *Smith v. Navistar International Transportation Corp.,* 687 F.Supp. 201 (D.Md.1988), for its discussion of the theory of a successor corporation's liability. We find, however, this case to be inapposite. *Navistar* uses the continuity of enterprise theory, which expands upon the existing mere continuation exception, in analyzing products liability. In the instant case, the issue was not one of products liability but rather a contractual liability to an employee of the original corporation. The reason for an expansion of the continuity of enterprise when dealing with product liability is clear—that is, the need to provide protection to a consumer who has no information relative to the internal corporate changes.

§§ 3–114 and 3–115 of the Corps. & Ass'ns Art., Md. Uniform Fraudulent Conveyance Act, and the Md. Bulk Transfers Act (discussed hereinafter). The policy is that, whenever there is a transfer of assets, the rights of a creditor must be protected. The "mere continuation" exception reinforces this policy by allowing a creditor to recover from the successor corporation whenever the successor is substantially the same as the predecessor. The exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors. In other words, the purchasing corporation maintains the same or similar management and ownership but wears a "new hat." *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir.1985). To allow the predecessor to escape liability by merely changing hats would amount to fraud. Thus, the underlying theory of the exception is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability. *Estey & Associates, Inc. v. McCulloch Corp.*, 663 F.Supp. 167, 171 (D.Or.1986).

Under this exception, a successor corporation may be liable for the debts of its predecessor if certain indicia are met. The indicia of continuation are:

"common officers, directors, and stockholders; and only one corporation in existence after the completion of the sale of assets. While the two foregoing factors are traditionally indications of a continuing corporation, neither is essential. Other factors such as continuation of the seller's business practices and policies and the sufficiency of consideration running to the seller corporation in light of the assets being sold may also be considered. To find that continuity exists merely because there was common management and ownership without considering other factors is to disregard the separate identities of the corporation without the necessary considerations that justify such an action."

15 W. Fletcher, *supra* § 7122 (Cum.Supp.1988). *See also* 19 Am.Jur.2d *Corporations, supra* § 2711; *Bud Antle,* 758 F.2d at 1458–59; *Roy v. Bolens Corp., FMC,* 629 F.Supp. 1070, 1072 (D.Mass.1986); *Groover v. West Coast Shipping Co.,* 479 F.Supp. 950, 951 (S.D.N.Y.1979); *Armour–Dial,*

*Inc. v. Alkar Engineering Corp.*, 469 F.Supp. 1198, 1201 (E.D.Wis.1979); *Ladjevardian v. Laidlaw–Coggeshall, Inc.*, 431 F.Supp. 834, 839 (S.D.N.Y.1977); *Kloberdanz v. Joy Manufacturing Co.*, 288 F.Supp. 817, 821 (D.Colo.1968); *Bullington v. Union Tool Corp.*, 254 Ga. 283, 328 S.E.2d 726, 727 (1985); *Stratton v. Garvey International, Inc.*, 9 Kan.App.2d 254, 676 P.2d 1290, 1298 (1984); *Young v. Fulton Iron Works Co.*, 709 S.W.2d 927, 940 (Mo.App.1986); *Grant–Howard Associates v. General Housewares Corp.*, 115 Misc.2d 704, 454 N.Y.S.2d 521, 524 (1982), *aff'd*, 97 A.D.2d 390, 467 N.Y.S.2d 1018 (1983), *reversed on other grounds*, 63 N.Y.2d 291, 482 N.Y.S.2d 225, 472 N.E.2d 1 (1984).

■ In the instant case, the trial judge found that, in essence, Baltimore Luggage (RI) was a mere continuation of Baltimore Luggage (MD). The trial judge pointed out that, although Baltimore Luggage (RI) was owned by different people, it continued the same business and name as its predecessors. The trial judge commented that it would be difficult for customers dealing with Baltimore Luggage (RI) to conceive that they were dealing with a separate entity. With regard to the existence of Balt–Lug, the trial judge noted that, although evidence was presented at trial that Balt–Lug was in existence in New York, there was evidence that it did not exist as a legal corporation in Maryland since it did not have a charter. Although the trial judge's observations of fact were in large part correct, we disagree with his conclusion. We find that these facts were an insufficient showing of common identity to make Baltimore Luggage (RI) a mere continuation of Baltimore Luggage (MD).

Here, there was a change of ownership and management. The fact that Carl Marks & Co. retained a minority interest in the stock in Baltimore Luggage (RI) is not sufficient to put this case within the exception in light of the other factors which establish a lack of continuity between the two companies. Insofar as the continuation of business, Baltimore Luggage (MD) acquired the assets, company name and trademark of a company that had been engaged in the sale of luggage for over 50 years. After the transfer, however, Baltimore Luggage (RI) liquidated its machinery

and equipment used in the manufacturing of luggage and began importing its luggage. Although the basic business of selling luggage continued, on balance, this is outweighed by the fact that the corporate entity changed.

Nor was there a sole corporation remaining after the sale. Although Baltimore Luggage (MD) became defunct as a Maryland corporation, its corporate life continues as a viable New York corporation. Admittedly, it lost its corporate charter for a time, but this was not determinative and will be discussed in more detail hereafter. Since the original sale, Balt–Lug has collected the proceeds from the sale, and thus retains valuable assets and continues to be entitled to the payments for the assets until 1993.

Additionally, there was sufficient consideration running to the seller from the purchasing corporation. The evidence shows that the sale was a bona fide one with Baltimore Luggage (RI) purchasing all the assets and accepting certain liabilities, excluding Holtzman's contract. Pursuant to the sales agreement, Baltimore Luggage (RI) paid $300,000 initially and executed two promissory notes upon which Baltimore Luggage (RI) has made substantial payments. These facts constitute an insufficient showing of circumstances to fall within the exception. We hold the continued existence of Baltimore Luggage (MD) as Balt–Lug and the change in management and ownership are sufficient to take this case out of the continuation exception. We hold the trial judge erred in concluding there was a continuation.

## BULK TRANSFERS ACT

Holtzman also contends that Baltimore Luggage (RI) is liable to him under Maryland's Bulk Transfers Act. A bulk transfer is defined as any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the material, supplies, merchandise or other inventory of an enterprise whose principal business is the sale of merchandise from stock, including manufacturers. Md. Com.Law Code Ann. § 6–102(1) and (3) (1975, 1988 Cum. Supp.). In the instant case, Baltimore Luggage (MD) transferred in bulk, all of its materials, supplies, merchandise and equipment to what would become Baltimore Luggage (RI). Furthermore, the principal business of Baltimore Luggage (MD) was the sale of merchandise from stock.

Thus, this transfer of assets is a bulk transfer and the Bulk Transfers Act would normally apply to this transfer.

Not every transaction which meets this general definition of a bulk transfer, however, will be subject to the provisions of the Act. Md.Com.Law Code Ann. § 6–103 (1975). Baltimore Luggage (RI) contends that the transfer of assets to it from Baltimore Luggage (MD) falls within the exceptions contained in § 6–103(6) and (7). In light of the purposes of the Act and the facts of this case, it is unnecessary for us to reach this point.

Maryland's Bulk Transfers Act serves at least two distinct purposes. The central and most commonly cited purpose of the Act is to protect the transferor's creditors from a fraudulent transfer of assets. Md.Com.Law Code Ann. § 6–101, comments 2–4 (1975). Moreover, if read as a whole, the Bulk Transfers Act reinforces the protection extended to purchasers against attachment of or levy on their newly acquired assets, if they diligently comply with the Act's provisions.

In the instant case, the transfer of assets violated neither purpose. The transfer of assets to Baltimore Luggage (RI) was not a fraudulent transfer to evade creditors. It was an arm's length transaction under which Baltimore Luggage (RI) took on substantially all of the seller's liabilities and obligations. Moreover, Baltimore Luggage (MD) acknowledged and retained its remaining obligations. Furthermore, because Baltimore Luggage (RI) expressly and voluntarily assumed substantially all of the seller's liabilities, it did not need the protections provided by compliance with the Act. Compliance with the Act, therefore, would have little, if any, impact on the transfer of assets. Thus, it is irrelevant whether or not the transfer of assets in this case fits within any of the types of transfers excepted from compliance.

Moreover, even if we assume for argument's sake that Maryland's Bulk Transfers Act applies, Holtzman does not have a claim based on this Act. Under the Bulk Transfers Act, a transferee is required to give any creditor of the transferor notice of the transfer prior to the actual transfer. Md.Com.Law Code Ann. § 6–105 (1975). If the transferee fails to give this notice, the transfer is ineffective against the transferor's creditors. *Id.* Holtzman received

no notice of the transfer of assets prior to its occurrence and thus the transfer would be ineffective against him.[11]

Maryland Com.Code Ann. § 6–111 (1975), however, provides in pertinent part:

> "No action under this title shall be brought nor levy made more than six months after the date on which the transferee took possession of the goods unless the transfer has been concealed."

Neither corporation made any attempt to conceal the transfer of assets. Holtzman learned of the transfer on or about November 2, 1983, the day after the Agreement for Purchase and Sale of Assets was dated. Holtzman did not bring this or any action against Baltimore Luggage (RI) until September 24, 1986, which was substantially more than six months from the date of transfer. Therefore, any claim Holtzman might have had under the Act is barred by the statute of limitations under § 6–111.

## THE POWER TO SUE OR BE SUED

■ Much has been made of the status of Baltimore Luggage (MD) at the time suit was filed. Appellee relies on the fact that a corporation loses its power to sue or be sued in its corporate name after it has become effectually dissolved. *Parkside Terrace Apartments, Inc. v. Lindner,* 252 Md. 271, 273, 249 A.2d 717 (1969). The power is not extinguished, however, unless there had been an effectual legal dissolution. The status of Baltimore Luggage (MD) at the time suit was filed is far from clear. Even if the corporation at that time lacked the capacity to be sued, which is not at all certain, the directors-trustees would have been "vested in their capacity as trustees with full title to all the assets of the corporation." Md.Corps. & Ass'ns Code Ann. § 3–410(b) (1975, 1985 Repl.Vol.). In that capacity, they could sue or be sued in their own names as trustees or in the name of the corporation. § 3–410(c)(3). The status of Baltimore Luggage (MD) at the time of filing of the suit is not controlling and the status of Balt–Lug is not in contention.

---

**11.** This assumes that an employee under contract is a creditor. Holtzman has not presented us with any Maryland cases specifically so holding, nor are we aware of any such case.

—Conclusion—

As noted previously, Baltimore Luggage (RI) is the successor corporation of Baltimore Luggage (MD). A successor corporation, however, does not assume the debts and liabilities of its predecessor except to the extent provided in the articles of transfer. The facts of the instant case fit none of the exceptions to this general rule nor does the failure of Baltimore Luggage (RI) to file articles of transfer have any impact on this case. Moreover, the Agreement for Purchase and Sale specifically provided that Baltimore Luggage (MD) would retain all liabilities for Holtzman's employment contract. Thus, Baltimore Luggage (RI), as a successor corporation, is not liable for, nor did it assume, the obligations of Holtzman's employment contract. Furthermore, Baltimore Luggage (RI) cannot be held liable under Maryland's Bulk Transfers Act, even if it applied. Finally, since Baltimore Luggage (MD) retained the obligations of Holtzman's contract, it was the appropriate entity to sue. For the foregoing reasons, we reverse the judgment of the trial court.

JUDGMENT REVERSED.

COSTS TO BE PAID BY APPELLEE.

### ON MOTION FOR RECONSIDERATION

Appellee has filed a Motion for Reconsideration of our decision reversing the judgment of the trial court, *Baltimore Luggage Co. v. Holtzman*, 80 Md.App. 282, 562 A.2d 1286 (1989). In that connection, they have submitted a certified statement from the State of New York dated September 21, 1989, which indicates that the records of the State of New York do not reveal a certificate to do business in the name of Balt–Lug Divesting Corp. Appellee also moved to open and correct the record by admitting this document. Appellee requests our reconsideration, contending that our decision was based in "large part upon [our] conclusion that Balt–lug Divesting Corp. was a viable New York corporation and 'exists today'...."

We were concerned that, at trial, evidence was adduced showing tax returns filed by Balt–Lug Divesting Corp. bearing a New York address for the corporation for critical years. Also, one Robert Davidoff, President of Balt–Lug

Divesting Corp., testified that Balt–Lug maintained a separate identity, had directors and officers; that it received income from the interest on notes receivable, filed regular corporate tax returns and that, while it had lost its charter, it had reincorporated in New York. We were also concerned that, in appellant's brief, counsel represented these facts as accurate. For these reasons, we requested a response to the certified statement. Appellant's response to appellee's Motion to Open and Correct the Record pointed out that, since the certificate was not a part of the record before the trial court, it may not be considered by this Court. We agree.

This is not a motion to correct the record under Rule 8–414; it is a motion to admit something into evidence that was not presented below. We could have, however, remanded the case under Rule 8–604(d) to permit further proceedings at which time additional evidence could, if appropriate, have been presented to the trial court. We do not conclude that the substantial merits of the case require such action; hence, we deny the Motion to Open and Correct the Record.

Our real concern, however, was the apparent misrepresentations to the trial court and this Court of the corporate status. Counsel for appellant and Davidoff, in his affidavit, implicitly now concede that appellee is correct; namely, the corporation of Balt–Lug Divesting Corp. is defunct, stating, not particularly enlighteningly:

"2. At the time of the trial of this proceeding, I believed that the Balt–Lug Divesting Corp. had been reincorporated pursuant to the laws of the State of New York. I believed that the necessary steps to achieve that reincorporation had been taken.

\* \* \*

"4. I am presently taking steps on behalf of Balt–Lug Divesting Corp. to revive its corporate charter in the State of Maryland by filing Articles of Revival. I will submit the approved Articles of Revival to this Court when the charter is revived."

Had we been in possession of the true situation, we would not have stated as factual that "Baltimore Luggage (MD), later became a New York corporation known as Balt–Lug Divesting Corp. (Balt–Lug) and exists today." *Baltimore Luggage*, 80 Md.App. at 285, 562 A.2d 1286. Nor would we have said, "Apparently, prior to trial, [Balt–Lug] reincorporated and was, as of the trial, a New York corporation." *Baltimore Luggage*, 80 Md.App. at 289, 562 A.2d 1286. And further, we would not have stated that Balt–Lug's "corporate life continues as a viable New York corporation." *Baltimore Luggage*, 80 Md.App. at 301, 562 A.2d 1286. That, however, does not alter our ultimate conclusion. We stated:

> "Much has been made of the status of Baltimore Luggage (MD) at the time suit was filed. Appellee relies on the fact that a corporation loses its power to sue or be sued in its corporate name after it has become effectually dissolved. *Parkside Terrace Apartments, Inc. v. Lindner*, 252 Md. 271, 273[, 249 A.2d 717] (1969). The power is not extinguished, however, unless there had been an effectual legal dissolution. The status of Baltimore Luggage (MD) at the time suit was filed is far from clear. Even if the corporation at that time lacked the capacity to be sued, which is not at all certain, the directors-trustees would have been 'vested in their capacity as trustees with full title to all the assets of the corporation.' Md.Corps. & Ass'ns Code Ann. § 3–410(b) (1975, 1985 Repl.Vol.). In that capacity, they could sue or be sued in their own names as trustees or in the name of the corporation. § 3–410(c)(3). The status of Baltimore Luggage (MD) at the time of filing of the suit is not controlling and the status of Balt–Lug is not in contention."

*Baltimore Luggage*, 80 Md.App. at 303–04, 562 A.2d 1286.

MOTION TO OPEN AND CORRECT RECORD DENIED.

MOTION FOR RECONSIDERATION DENIED.