**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JAY R. HERN,

<u>Plaintiff-Appellant,</u>

v.

TELSYS INTERNATIONAL,

No. 96-2045

INCORPORATED, a Delaware
Corporation; TSI TELSYS,
INCORPORATED, a Maryland
Corporation; JAMES R. CHESNEY,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Harvey II, Senior District Judge.
(CA-95-3169-H)

Argued: July 17, 1997

Decided: February 19, 1998

Before MURNAGHAN, Circuit Judge, and BUTZNER and
PHILLIPS, Senior Circuit Judges.

_____

Vacated and remanded by unpublished opinion. Senior Judge Butzner
wrote the opinion, in which Judge Murnaghan and Senior Judge
Phillips joined.

_____

**COUNSEL**

**ARGUED:** Stephen Laurence Joseph, LAW OFFICES OF STE-
PHEN L. JOSEPH, ESQ., Washington, D.C., for Appellant. Gary L.

Bohlke, SEMMES, BOWEN & SEMMES, Baltimore, Maryland, for Appellees. **ON BRIEF:** Kent K. Matsumoto, SEMMES, BOWEN & SEMMES, Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

BUTZNER, Senior Circuit Judge:

Jay R. Hern appeals the district court's entry of summary judgment in favor of TelSys International, Inc. (TelSys), TSI TelSys, Inc. (TSI TelSys), and James R. Chesney. Because the record discloses genuine issues of material fact, we vacate the district court's judgment and remand the case for trial.

I

James R. Chesney was an employee of the National Aeronautic and Space Administration (NASA) stationed at Goddard Space Flight Center, Maryland. He was the head of the microelectronic systems branch at the time of his retirement in 1994. His speciality was telemetry. Chesney recognized that telemetry had many potential applications in addition to its use by the government. In their spare time, he and several of his colleagues sought funding so they could make their expertise in telemetry available for both governmental and civilian use. Chesney called the persons who worked with him the team. Over the course of time they developed business plans, but they were unsuccessful in receiving funding.

Chesney realized that the team needed a person with"expertise in preparing financial and corporate administrative information for the business plan." J.A. 608. He also recognized that any potential investor would be more likely to fund a corporation rather than a team of individuals. Chesney selected Jay R. Hern, a family friend who had

2

a corporate and management background, to join the effort and to form and manage a new corporate venture. The proposed venture, according to Chesney's letter to Hern, involved the development and sale of telemetry components and systems. Chesney, speaking for the team, offered Hern the position of president/chief operations officer, at a salary of $150,000 a year, shares in the corporation, and appropriate benefits, effective August 1, 1992. At Chesney's request, Hern arranged for the incorporation of TelSys International, Inc., in Delaware on November 13, 1992. At Hern's request, TelSys' counsel drafted an employment agreement for Hern that followed Chesney's letter offering Hern a job. The agreement was backdated to the date of incorporation, and it provided that Hern's pay was contingent upon TelSys' receipt of funding.

Chesney asked Hern to resign on August 30, 1993, because of conflicts with other team members, the employment agreement, and a potential investor's reservations. There was a dispute about the amount and quality of Hern's services. Chesney was still a government employee at the time, not an officer or director of TelSys, and therefore without authority to demand Hern's resignation. TelSys' counsel drafted a resignation letter which provided that Hern would receive $130,000, Hern's full salary to date, to be paid in installments when TelSys received funding. Hern signed the resignation letter on September 1, 1993. Peter Campisi as secretary-treasurer and director of TelSys accepted Hern's resignation on behalf of TelSys.

At the same time Chesney agreed to pay Hern 15% of the profits Chesney received with a cap of $50,000. Chesney intended his promise to be personal and not an obligation of TelSys.

Shortly after Chesney resigned from NASA in May 1994 the TelSys board elected him chairman, director, and CEO of TelSys.

On August 17, 1994, International Contour Technology, Inc. (Contour), a Canadian firm, agreed to fund a new venture as outlined in the Business Plan. For reasons explained by its vice-president, Contour insisted on forming a new company. The first reason was that the Federal Bureau of Investigation had launched an investigation of Chesney and TelSys. It was essential to have a "clean" company which would permit Contour to represent to investors that the com-

3

pany was not involved in any FBI investigation. The second reason was to avoid contingent liabilities that TelSys had incurred, including the obligation to Hern. In accordance with Contour's requirements, a new company named TSI TelSys, Inc., was incorporated in Maryland on August 18, 1994, and Contour provided some funding. Ultimately, TelSys became a dormant corporation because it did not pay its taxes.

Chesney strongly opposed the formation of a new company. In a letter addressed to the officers of Contour he said:

> My understanding is that Contour will not consider reimbursing Ackerson & Bishop [TelSys' former law firm] or Mr. Hern, either from equity funds provided by Contour or from future revenues of TelSys. I understand and will accept Contour's position. But, I must express my personal view that to never reimburse a debt for services provided in good faith (regardless of their ultimate value to TelSys) is bad business. I do not want to pay these debts in the early months of the company and planned to achieve this deferral through negotiation. However, refusal to reimburse ever is inappropriate and potentially damaging to TelSys.

> Gary Bohlke [TelSys' counsel] also explained that Contour desires that a new corporation be established to avoid these contingent liabilities. I will accept Contour's direction, but may I first suggest that you research this point further and confirm this item. We are advised that, under American law, such an action is pointless since our courts would consider the new corporation a transparent ruse to avoid a legitimate liability. If this is true, then the only sure result of a new corporation will be increased legal fees. (emphasis in original).

He signed the letter TelSys International, Inc., James R. Chesney, Chairman. Also, Bruce G. Montgomery, a consultant who later became an officer of TSI TelSys, wrote Chesney:

> I reiterate my earlier comment to you about the probable uselessness of creating a new corporation to avoid contin-

4

gent liabilities associated with TelSys. The only sure consequence of a new corporation will be higher legal fees.

In the end, however, Chesney acquiesced in Contour's terms.

Hern subsequently requested payment of $130,000 in accordance with his resignation agreement. TelSys and TSI TelSys denied the request on the ground that TelSys never received funding.

Hern brought suit alleging diversity jurisdiction. He asserts causes of action based on breach of contract, fraudulent conveyance, violation of Delaware law, and TSI TelSys' status as a successor corporation. TelSys, TSI TelSys, and Chesney defend on the grounds that TelSys' liability to Hern was contingent upon the receipt of funding by TelSys, that TelSys has not received any funding, that TelSys never had assets, and that TSI TelSys is not liable as a successor corporation because it received no assets from TelSys.

Both parties filed motions for summary judgment. From their submissions it is apparent that decision of their respective positions depends primarily on the resolution of a factual dispute: Did TelSys have any assets?

The district court granted summary judgment to TelSys, TSI TelSys, and Chesney. It held that the payment of $130,000 provided in Hern's resignation agreement was by its terms contingent on TelSys' receipt of funding, but TelSys never received any funding, and, consequently, Hern could not prevail. The court recognized that the Business Plan was a valuable asset, but it held that TelSys did not own the Business Plan; that the plan belonged to Chesney and his team. The district court also held that TSI Telsys was not liable as a successor corporation or as the recipient of a fraudulent conveyance from TelSys because TelSys had no assets to convey.

II

We review the district court's decision to grant summary judgment de novo. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). Summary judgement is appropriate if, after examining the entire record, the

5

court concludes that there exists no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgement must initially show "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The opposing party, to survive the motion for summary judgment, "need only present evidence from which a jury might return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The evidence is to be viewed and reasonable inferences are to be drawn in the favor of the nonmoving party. Id. at 255. A scintilla of evidence is insufficient to bar summary judgment. See id. at 251.

Maryland's leading case pertaining to corporate successor liability is Baltimore Luggage Co. v. Holtzman, 80 Md. App. 282, 562 A.2d 1286 (1989). "The general rule of corporate liability is that, ordinarily, a corporation which acquires the assets of another corporation is not liable for the debts and liabilities of the predecessor corporation." Baltimore Luggage, 80 Md. App. at 290, 562 A.2d at 1289. There are four exceptions to this rule. A successor will be liable for the debts of its predecessor when "(1) there is an expressed or implied assumption of liability; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is a mere continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for debts." Baltimore Luggage, 80 Md. App. at 290, 562 A.2d at 1290.

Maryland has codified the second exception, consolidation or merger. When there is a consolidation or merger,"[t]he successor is liable for all the debts and obligations of each nonsurviving corporation." Md. Code Ann., Corps. & Ass'ns § 3-114(e)(1) (1993 & Supp. 1997).

The fourth exception is codified as the Maryland Uniform Fraudulent Conveyance Act. See Baltimore Luggage, 80 Md. App. at 290, 562 A.2d at 1290. This act provides: "Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." Md. Code Ann., Comm'l Law§ 15-204 (1990).

6

III

Hern contends that the principal asset of TelSys was the Business Plan. Other assets, according to Hern, were TelSys' name, logo, network of contacts, and work product. Hern supported his testimony about TelSys assets by reference to documents that suggest that TelSys and Chesney viewed the Business Plan to be a TelSys asset.

In May 1994, TelSys prepared an initial working draft of its Business Plan, which served as a prospectus for investors. The Business Plan was labeled "proprietary," and it contained a notice of confidentiality that prohibited its reproduction or use "without the prior written permission of TelSys International, Inc."

In July 1994, TelSys prepared a document it called "TelSys Business Plan Summary." Each page bore the legend "TelSys' proprietary information."

On August 15, 1994, TelSys entered into an agreement with William L. Babcock which refers to "Proprietary Information owned separately by TelSys." The agreement describes proprietary information as documents "relating to TelSys' business and/or products and/or future planned business and/or products which are clearly marked as being Proprietary Information." The agreement was signed by Babcock and "TelSys International, Inc., James Chesney, Chairman."

TSI TelSys, TelSys, and Chesney support their motion for summary judgment with the team's affidavits averring that the team owned the Business Plan and that TelSys had no assets.

At this stage of the litigation, inasmuch as all reasonable inferences must be drawn in favor of Hern, the nonmoving party, one can reasonably infer from TelSys documents, which Hern cites, that TelSys owned the Business Plan. Moreover, the evidence and the inferences that reasonably can be drawn from the evidence disclose genuine issues of material fact about the ownership of the Business Plan that preclude summary judgment. See Fed. R. Civ. P. 56(c).

One can also reasonably infer that TelSys transferred this asset to TSI TelSys. In its letter agreement of August 17, 1994, International

7

Contour Technology, Inc., proposed that the business of the new corporation, TSI TelSys, "is to be that set out in the business plan we reviewed and it is understood that it is that business (telemetry and telecommunications) which Contour is agreeing to fund." Chesney was to become Chief Executive Officer of TSI TelSys, and he accepted the proposal in his own behalf and in behalf of the new corporation, TSI TelSys. Chesney, however, did not accept the proposal until after he and Montgomery, who became a vice president of TSI TelSys, strongly protested the formation of a new company to escape liability for TelSys contingent debts including the amount owed Hern. See Part I infra.

Gary R. Bahsler testified that International Contour Technology, Inc., had changed its name to TSI TelSys and that he was its president. His deposition contains the following question and answer:

> Q. Do you know whether there was any difference between what Corporation 1 [TelSys] was proposing to do as a business purpose and what Corporation 2 [TSI TelSys] was proposing to do as a business purpose?
>
> A. My understanding would be that the primary purpose would be the same.

Similarly, Chesney's deposition contains the following question and answer:

> Q. I am asking if that is correct. Corporation Two's [TSI TelSys'] business is exactly the same as Corporation One's [TelSys'] business.
>
> A. The activities of Corporation Two do reflect the intent of the business plan and the presentations provided to investors.

From the evidence one can reasonably infer that TelSys transferred the Business Plan to TSI TelSys, leaving TelSys insolvent. Because a stated reason for the formation of TSI TelSys was to avoid paying Hern, it is apparent that a genuine issue of material fact exists con-

8

cerning the fourth exception in Baltimore Luggage: "The transaction is entered into fraudulently to escape liability for debts." 80 Md. App. at 290, 562 A.2d at 1290. Also, by the terms of Maryland Fraudulent Conveyance Act it is not necessary to prove actual fraudulent intent, and the rights of a creditor with respect to the property conveyed can be secured. See Md. Code Ann. §§ 15 209, -210. It will be, however, necessary for Hern to prove that TelSys had assets including the Business Plan about which there is a genuine issue of material fact.

The third exception of Baltimore Luggage applies when the "purchasing corporation is a mere continuation of the selling corporation." 80 Md. App. at 290, 562 A.2d at 1290.

> The exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors. In other words, the purchasing corporation maintains the same or similar management and ownership but wears a "new hat." To allow the predecessor to escape liability by merely changing hats would amount to fraud. Thus, the underlying theory of the exception is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.
>
> * * *
>
> The indicia of continuation are: "common officers, directors, and stockholders; and only one corporation in existence after the completion of the sale of assets. While the two foregoing factors are traditionally indications of a continuing corporation, neither is essential. Other factors such as continuation of the seller's business practices and policies and the sufficiency of consideration running to the seller corporation in light of the assets being sold may also be considered." 80 Md. App. at 297, 562 A.2d at 1293 (citations omitted).

It is clear from the evidence that one of the reasons TSI TelSys was formed was to escape liability for Hern's contingent debt. Chesney occupied the same position in the old and new company. Chesney and

9

TelSys' counsel allowed TelSys to become dormant, though still in existence. But the dormant existence of TelSys does not defeat Hern's action brought under the exceptions to <u>Baltimore Luggage</u>. <u>See</u> 80 Md. App. at 297, 562 A.2d at 1293. An important indicia of the third exception is the continuation of TelSys business as described in its Business Plan. Although TSI TelSys revised the Business Plan, it used the TelSys Business Plan to explain to investors the company's work. Moreover, TSI TelSys' revised Business Plan frequently referred to TelSys in its text.

TSI TelSys paid TelSys' counsel approximately a quarter of a million dollars for work he did for TelSys. TSI TelSys also paid a finder's fee in an undisclosed sum for service performed for TelSys. Payment for these services, like the obligation to Hern, was also contingent on TelSys' receipt of funding. These payments give rise to reasonable, conflicting inferences ranging from gifts--very unlikely --to acknowledgment of indebtedness to all TelSys creditors except Hern. TSI TelSys' payments for services incurred by TelSys also give rise to inferences that involve indicia of TSI TelSys status as a successor corporation of TelSys.

At this stage of the proceedings, we must give Hern, as the non-moving party, the benefit of inferences pertaining to the exceptions in <u>Baltimore Luggage</u>, 80 Md. App. at 290, 562 A.2d at 1290. These inferences reasonably arise from facts which the evidence discloses: the similarity in Chesney's position in both companies; the similar business purpose of the companies; TelSys' assertion that it owned the information pertaining to the Business Plan; TelSys' protection of its proprietary interest in the Business Plan; the similarity in design, but not the text of the TelSys and TSI TelSys logos; the use of TelSys' name in the TSI TelSys Business Plan; the effort to avoid paying Hern by incorporating TSI TelSys; and TSI TelSys' payment of TelSys' other conditional creditors.

Hern's recovery, if any, is not precluded by the fact that TelSys' obligation to him was contingent. The Maryland Fraudulent Conveyance Act, Md. Code Ann. § 15-201(d), defines "creditor" to include a person who has a contingent claim. Section 15-201(e) defines "debt" to include a contingent legal liability.

As we have previously noted, Hern's recovery, if any, depends in large part on whether TelSys had any assets and whether TSI TelSys is liable as a successor to TelSys. If these inquiries are answered in Hern's favor, we turn to Delaware law to determine the effect of merger or consolidation involving a Delaware corporation. Section 259(a) of the Delaware General Corporation Law provides in part:

> [A]ll debts, liabilities and duties of the respective constituent corporations [TelSys] shall thenceforth attach to said surviving or resulting corporation [TSI TelSys], and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

To the same effect, Md. Code Ann. § 3-114(e) provides that the successor [TSI TelSys] is liable for "debts and obligations" of the non-surviving corporation [TelSys].

IV

Chesney's promise to pay Hern up to $50,000 from his personal profits discloses a genuine issue of material fact concerning consideration. Chesney maintains that he was under no legal obligation to pay Hern. He asserts that he did it out of the goodness of his heart to sweeten the deal by easing Hern's resignation. Chesney looked upon it as a family affair. Hern contends that the promise was made to induce him to resign from TelSys by paying him compensation for the lost opportunity of an equity position in TelSys. The district court granted summary judgment to Chesney on the ground that payment depended on TelSys' receipt of funding and the subsequent generation of profits for Chesney. The district court pointed out that TSI TelSys, not TelSys, received funding and TelSys never had any profits. The court held that TSI TelSys was not a successor corporation. It decided that Chesney did not breach a contract with Hern because an essential condition was never satisfied.

Decision of Hern's breach of contract action against Chesney, however, involves the resolution of credibility issues, which is not the function of summary judgment, and resolution of genuine issues of material fact pertaining to successor liability.

11

V

Hern also claims TelSys is liable because it violated Del. Code Ann. Title 8, §§ 274, 275, 280, and 281 by failing to wind up its affairs properly for the protection of its creditors. The outcome of this cause of action depends on whether TelSys had any assets and whether TSI TelSys is a successor corporation. As previously noted, there are genuine issues of material fact concerning these questions.

VI

We conclude that summary judgment was an inappropriate procedure for deciding whether TSI TelSys is a successor of TelSys, whether TelSys fraudulently conveyed assets to TSI TelSys, whether Chesney is liable to Hern, and whether TelSys failed to wind up its affairs in accordance with Delaware law. Regarding all these questions there are genuine issues of material fact which require trial. The district court's judgment is vacated, and the case is remanded. Hern shall recover his costs.

VACATED AND REMANDED

12